**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **IMANI NEMBHARD,** | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO.  1:21-cv-350** |
| | § | |
| **WILLIAMSON COUNTY, TEXAS,** | § | |
| **ROBERT CHODY, and** | § | |
| **CHRISTOPHER PISA,** | § | |
| *Defendants*. | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

COMES NOW, Imani Nembhard, Plaintiff, complaining of Williamson County, Texas, Robert Chody, and Christopher Pisa, and for causes of action will respectfully show unto the Court as follows:

> If there is a reckless disregard for human life and safety prevalent among the city's police officers which threatens the life and security of those whom they encounter, and if that recklessness is attributable to the instruction or example or acceptance of or by the city policymaker, the policy itself is a repudiation of constitutional rights.

*Grandstaff v. City of Borger, Tex.*, 767 F.2d 161, 170 (5th Cir. 1985).

1

## SUMMARY

Williamson County, under the direction of its policymaker Sheriff Robert Chody, created a culture referred to as "Wilco Badass" which incentivized using excessive force, refused to hold deputies accountable for assaulting citizens, deliberately provided inadequate training to young deputies and failed to supervise young inexperienced and undertrained deputies, ignored red flags when hiring deputies with histories of violence, and shifted the purpose of the department from increasing public safety to increasing television ratings through assaults and even death on the show Live PD.

On April 21, 2019, Deputy Christopher Pisa used unnecessary and excessive force against Imani Nembhard, a Black mother of two in the Army Reserves, after pulling her over for failing to have a front license plate on her car. Pisa then resigned his position as a Deputy Sheriff before being indicted by a Grand Jury for Official Oppression and Assault Causing Bodily Injury for his use of excessive force against Ms. Nembhard.

During a Texas Ranger investigation into Pisa's use of force on Ms. Nembhard, Pisa revealed that the Williamson County Sheriff's Department rewarded deputies with steakhouse gift cards who were "Wilco Badass" and used force against citizens. Pisa admitted that he expected to receive a steakhouse gift card for his use of force against Ms. Nembhard. Shockingly, Williamson County has rehired Pisa despite his criminal charges.

Ms. Nembhard brings this lawsuit against Williamson County, Texas, former Sheriff Robert Chody, and rehired Williamson County Sheriff's Deputy Christopher Pisa for violations of her right to be free from illegal seizures by way of excessive force under the Fourth Amendment to the United States Constitution. This is one lawsuit of many against a County that has been run like a state sanctioned gang, terrorizing citizens under the maxim of being "Wilco Badass."

# I.
## PARTIES

1.      Plaintiff Imani Nembhard is a resident of Bell County.

2.      Defendant Williamson County, Texas is a governmental entity in Texas. It may be served through its County Judge, Bill Gravell, Jr., at 710 S. Main St. #101, Georgetown, TX 78262.

3.      Defendant Robert Chody was the elected Sheriff of Williamson County, Texas at all relevant times. As such, Sheriff Chody was the policymaker for Williamson County as it related to the Sheriff's Department. He is a resident of Williamson County, Texas. At all relevant times, he was acting under color of law. He may be served with process at the Williamson County Sheriff's Office, 508 South Rock St., Georgetown, TX 78626, or wherever he may be found. Defendant Chody is sued in his individual capacity.

4.      Defendant Christopher Pisa is an employee of the Williamson County Sheriff's Department. At all relevant times, he was a deputy of the Williamson County Sheriff's office and he was acting under color of law. He may be served with process at the Williamson County Sheriff's Office, 508 South Rock St., Georgetown, TX 78626. Defendant Pisa is sued in his individual capacity.

# II.
## JURISDICTION AND VENUE

5.      The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1343 since Plaintiff is suing for relief under 42 U.S.C. § 1983.

6.      Venue is proper in the Western District of Texas pursuant to 28 U.S.C. §1391 because the Defendants are domiciled and/or reside in the Western District of Texas, and all or a substantial part of the cause of action accrued in the Western District of Texas.

## III.
## FACTS AND ALLEGATIONS

1.     Under Texas law, sheriffs are "final policymakers" in the area of law enforcement for the purposes of holding a county liable under § 1983. *James v. Harris Cty.*, 577 F.3d 612, 617 (5th Cir. 2009); citing *Williams v. Kaufman County*, 352 F.3d 994, 1013 (5th Cir.2003).

2.     As sheriff, Defendant Robert Chody was the Williamson County final policymaker and had been delegated policy-making authority by the Williamson County Commissioners Court.

3.     Defendant Christopher Pisa was a deputy with the Williamson County Sheriff's Department.

### Defendant Pisa Used Excessive Force Against Ms. Nembhard

4.     On April 21, 2019, Plaintiff Imani Nembhard was driving her brother's car through Williamson County, Texas.

5.     Ms. Nembhard had her two young daughters in the backseat of the vehicle with her.

6.     Ms. Nembhard was pulled over by law enforcement twice that day because her brother's vehicle, which she was driving, did not have a front license place.

7.     During the first traffic stop, the officer was polite and nothing out of the ordinary occurred.

8.     However, the second traffic stop was performed by Defendant Pisa of the Williamson County Sheriff's Department and it went drastically different for Ms. Nembhard.

9.      From the beginning of the encounter, Defendant Pisa was rude with Ms. Nembhard.

10.     After running Ms. Nembhard's information in the system and confirming no warrants, Defendant Pisa asked her if she loved her children who were in the vehicle.

11.     Ms. Nembhard was taken aback and responded by asking if he believed his parents loved him.

12.     Defendant Pisa asked Ms. Nembhard to turn off her vehicle.

13.     Ms. Nembhard was uncomfortable with this as she had her two young daughters in the backseat.

14.     Defendant Pisa then demanded Ms. Nembhard exit her vehicle.

15.     Ms. Nembhard was shocked as this was not required during her earlier traffic stop that day.

16.     Ms. Nembhard asked why she needed to exit her vehicle with her two young daughters in the backseat.

17.     Defendant Pisa told Ms. Nembhard she could get out or he would pull her out of the car.

18.     Ms. Nembhard complied by exiting the vehicle.

19.     Once she stepped out of the vehicle, Defendant Pisa ordered her to put her hands behind her back.

20.     Ms. Nembhard asked why she needed to do so.

21.     Defendant Pisa immediately reached to grab Ms. Nembhard's wrist.

22.     Ms. Nembhard agains asked why she needed to put her hands behind her back.

23.     Defendant Pisa, without attempting any further negotiation, grabbed Ms. Nembhard and slammed her face first onto the ground causing her pain.

24.     Ms. Nembhard's two young daughters watched in terror from the backseat as Defendant Pisa assaulted their mother before their eyes.

25.     Defendant Pisa then got on top of Ms. Nembhard and put his knee into her back causing her pain.

26.     Ms. Nembhard was wearing a dress, which had been pulled up to her breast as Defendant Pisa slammed her to the ground and then got on top of her pushing his knee into her back.

27.     Ms. Nembhard was not wearing under garments that day and her genital area was exposed and scraped across the pavement as Defendant Pisa continued forcing his knee into her back as he was on top of her on the ground.

28.     Ms. Nembhard's two young daughters were screaming in terror as Defendant Pisa assaulted their mother on the other side of the car door.

29.     Defendant Pisa then grabbed Ms. Nembhard's hair, which she was wearing in braids, and ripped multiple braids out of her scalp.

30.     Defendant Pisa rolled Ms. Nembhard over onto her back.

31.     Defendant Pisa then pulled Ms. Nembhard to her feet and handcuffed her.

32.     Defendant Pisa then threw her into the backseat of his patrol vehicle.

33.     Ms. Nembhard's eight-year-old daughter called Ms. Nembhard's brother.

34.     Defendant Pisa told Ms. Nembhard's brother that if he did not arrive soon, Ms. Nembhard's two daughters would be going to Child Protective Services.

35.     At no time did Ms. Nembhard actively resist Defendant Pisa, as she complied with his order to exit the vehicle and then simply questioned why she was being

told to put her hands behind her back during a routine traffic stop for failure to have a front license plate on the vehicle, which she had been warned about earlier in the day and released without issue.

36.    At no time did Ms. Nembhard strike, punch, hit, push, or kick Defendant Pisa.

37.    At no time did Ms. Nembhard threatened Defendant Pisa physically or verbally, as she complied with his order to exit the vehicle and then simply questioned why she was being told to put her hands behind her back during a routine traffic stop for failure to have a front license plate on the vehicle, which she had been warned about earlier in the day and released without issue.

38.    At no time did Ms. Nembhard attempt to evade or flee from Defendant Pisa, as her two young children were in the back seat of the vehicle, she was driving her brother's car, and she never took any steps or actions indicating an attempt to flee.

39.    At no time was Ms. Nembhard armed with a weapon, nor did she ever reach for her pockets or anywhere that a weapon could have been kept or commit any action that could have reasonably given Defendant Pisa any reason to believe she was armed or was reaching for a weapon.

40.    Defendant Pisa then drove away to take Ms. Nembhard to jail before Ms. Nembhard's brother could arrive.

41.    Ms. Nembhard's shoulder and back were hurting from where Defendant Pisa had assaulted her.

42.    Ms. Nembhard could feel she had been cut on her genital area from where Defendant Pisa scraped Ms. Nembhard's naked body against the pavement.

43.     Ms. Nembhard requested a female to provide her with medical attention at the jail.

44.     However, the jail staff told her that they did not have a female to provide her medical attention, so she had to be transported to the hospital.

45.     Ms. Nembhard requested another officer transport her to the hospital.

46.     However, she was told she had to stay with Defendant Pisa, who had just assaulted her in front of her children and caused the injuries which necessitated medical attention.

47.     At the hospital, an x-ray showed Defendant Pisa sprained her shoulder when he slammed her onto the ground, got on top of her, and put his knee into her back.

48.     Ms. Nembhard had abrasions on her genital area from when Defendant Pisa scraped her naked body against the pavement.

49.     Ms. Nembhard's had a contusion on her knee.

50.     Ms. Nembhard's hair had been ripped out of her scalp at the root.

51.     Defendant Pisa restrained Ms. Nembhard to the hospital bed with handcuffs.

52.     Ms. Nembhard informed a nurse that she needed to use the restroom.

53.     However, Defendant Pisa told the nurse not to assist Ms. Nembhard and refused to allow her to use the restroom.

54.     Ms. Nembhard was forced to urinate off the side of the hospital bed because Defendant Pisa would not allow her to use the restroom.

55.     Ms. Nembhard was falsely charged with Assault on a Public Servant and Resisting Arrest stemming from this incident.

56.     Ms. Nembhard spent three days and two nights in jail.

57.    Both charges were dismissed after prosecutors watched the video and determined Ms. Nembhard did not commit the criminal offenses, and instead, Defendant Pisa had used excessive force against Ms. Nembhard.

58.    Defendant Pisa resigned from the Williamson County Sheriff's Department two days after his use of excessive force against Ms. Nembhard in front of her two young daughters.

59.    As will be discussed below, Defendant Pisa was shocked when he was asked to resign as he believed he was going to be rewarded with a steakhouse gift card by the department for his use of force against Ms. Nembhard, as was the custom and practice at the Williamson County Sheriff's Department under the direction of Defendant Chody.

60.    In October of 2019, Defendant Pisa was indicted by a Grand Jury for one count of Official Oppression and one count of Assault Causing Bodily Injury for his excessive use of force against Ms. Nembhard, which makes the basis for this lawsuit.

61.    At all times during the traffic stop, use of excessive force, and refusal to allow her to use the restroom, Defendant Pisa was acting under color of law and pursuant to the customs and practices of the Williamson County Sheriff's Department and Defendant Chody.

### Williamson County's Custom and Practice of Using Excessive Force, Adopting the Nickname "Wilco Badass"

62.    Williamson County created a culture of constitutional violations through incentivizing the excessive use of force, refusing to hold deputies accountable for assaulting citizens, deliberately providing inadequate training to young deputies, ignoring red flags when hiring deputies with histories of violence, and shifting the purpose of the

department from increasing public safety to increasing television ratings through assaults and even death.

63.    As will be discussed further below, the Austin American-Statesman analyzed 124 use-of-force reports from 2017 to 2019 and discovered that only two cases over the three years analyzed did supervisors find policy violations.

64.    On January 25, 2019, Williamson County Sheriff's Deputies used excessive force against Scott Lewis, despite there being no legal justification to do so and pursuant to the Williamson County practice and custom of using excessive force to be "Wilco Badass."[1] No deputies were disciplined for this use of excessive force.

65.    On February 24, 2019, Williamson County Sheriff's Deputies used excessive force against Charles Thornburg, despite there being no legal justification to do so and pursuant to the Williamson County practice and custom of using excessive force to be "Wilco Badass." No deputies were disciplined for this use of excessive force.

66.    On March 28, 2019, Williamson County Sheriff's Deputies used excessive force killing Javier Ambler, despite there being no legal justification to do so and pursuant to the Williamson County practice and custom of using excessive force to be "Wilco Badass." No deputies were disciplined for this use of excessive force.

67.    On April 10, 2019, Williamson County Sheriff's Deputies used excessive force against Spencer Murphy, despite there being no legal justification to do so and pursuant to the Williamson County practice and custom of using excessive force to be "Wilco Badass." No deputies were disciplined for this use of excessive force. Over six months later, Deputy Lorenzo Hernandez was removed from his position as a field

---

[1] "Wilco" is a common nickname for Williamson, County, Texas.

training officer over this incident; however, he was promoted to detective shortly thereafter.

68.    On June 2, 2019, a Williamson County Sheriff's Deputy used excessive force against Marquina Gilliam-Hicks by slamming her to the ground for failing to identify herself during a consensual encounter, despite there being no legal justification to do so and pursuant to the Williamson County practice and custom of using excessive force to be "Wilco Badass." This deputy was not disciplined for this use of excessive force.

69.    On June 14, 2019, the same Williamson County Sheriff's Deputies that killed Javier Ambler used excessive force against Ramsey Mitchell, despite there being no legal justification to do so and pursuant to the Williamson County practice and custom of using excessive force to be "Wilco Badass." The deputies again were not disciplined for this use of excessive force.

## Deputies were Incentivized to Use Force and to be "Wilco Badass"

70.    The Williamson County Sheriff's Office and Defendant Robert Chody incentivized violence and use of force by Williamson County Sheriff's Deputies by rewarding them with fame and fortune.

## Use Force, Get a Steak Dinner

71.    The Williamson County Sheriff's Department rewarded deputies who used force on the job with steakhouse gift cards, incentivizing violence and ultimately constitutional violations, like the one Defendant Pisa committed against Ms. Nembhard in this case.

72.    Following Defendant Pisa's resignation from the Williamson County Sheriff's Department, the Texas Rangers interviewed him as part of their investigation into his use of force against Ms. Nembhard, which forms the basis of this lawsuit.

73.    During that investigation, Defendant Pisa spoke about Williamson County's use of force incentive program with the steakhouse gift cards.

74.    Among the deputies who received gift cards to places such as Logan's Roadhouse were J.J. Johnson and Zach Camden, the officers involved in the March 2019 death of Javier Ambler II.

75.    Former Sgt. Troy Brogden, who resigned from the department in 2019, corroborated Pisa's claim regarding Williamson County using gift cards as incentives for using force.

76.    Defendant Pisa claimed that Commander Deaton would talk about the gift cards during meetings, "It was something everybody knew," Pisa said. "He has even said it to people in meetings."

77.    Former Sgt. Brogden echoed this when he stated, "He [Deaton] would talk about it [gift cards rewarding use of force] in groups, including supervisors meetings and classes," Brogden said. "I was like, 'What the hell?'"

78.    Brogden worked for the agency for 20 years, including as a supervisor overseeing major cases in the Criminal Investigations Division, before resigning last fall.

79.    Defendant Pisa said the department's practice of handing out gift cards in certain use-of-force cases was "common knowledge" and that Deaton was responsible for reviewing incidents and awarding the cards.

80.    Defendant Pisa explained, "[t]hey had the intention that we were all 'WilCo badass' and, if you went out there and did your job and you had to use force on somebody and he agreed with it, then you would get a gift card."

81.    As will be discussed further below, the Austin American-Statesman analyzed 124 use-of-force reports from 2017 to 2019 and discovered that only two cases over the three years analyzed did supervisors find policy violations.

82.    Accordingly, Williamson County always agreed with the uses of force (98 percent of the time over these three years) and these gift cards were being given for using force generally and were an incentive to use force even when force was not justified.

83.    Defendant Pisa stated during his interview with the Texas Rangers that he thought he was going to get a gift card from Deaton because he hands out gift cards for use of force.

84.    Thus, Williamson County's use of force incentive program rewarding deputies with steakhouse gift cards when they used force directly caused Defendant Pisa to use force against Ms. Nembhard in this case in violation of her Constitutional rights.

### Use Force, Get On TV

85.    The Williamson County Sheriff's Department also incentivized violence and ultimately constitutional violations, like the one Defendant Pisa committed against Ms. Nembhard in this case, through the use of "Live PD," a reality television program that filmed Williamson County deputies on the job.

86.    In 2018, Defendant Chody entered a contract to produce a television program called "Live PD."

87.    The Williamson County Commissioners' Court voted unanimously to approve this agreement.

88.    Live PD producers and camera operators rode with officers from police departments and record their activities for broadcast.

89.    Live PD was not actually "live," and the various police departments that appear on it (including Williamson County's) can selectively veto any content they do not wish to air.

90.    Live PD turned serious criminal justice matters into crass entertainment.

91.    Defendant Chody was well-aware that Live PD was an entertainment program.

92.    Several of Defendant Chody's officers, including Defendant Johnson, were regularly featured on Live PD.

93.    Defendant Chody regularly promoted Live PD on his social media platforms.

94.    Defendant Chody considered Live PD a "necessary tool to assist with the successful accomplishment of his core duties," including by allegedly "provid[ing] transparency and awareness to the public," by "increase[ing] recruiting efforts," by allegedly "provid[ing] an independent and unbiased visual on how the deputies are operating on the streets," by "provid[ing] a tool for creating better and more efficient protocols for finding missing persons," by allegedly "provid[ing] a tool to ensure laws, policies, rights, obligations and duties are adhered to," by allegedly "provid[ing] a tool for greater checks and balances in the officer," and by allegedly "provid[ing] a tool for protecting the employees and agency."

95.    Defendant Chody tweeted, "The Williamson County Sheriff's Office is proud & excited to announce that we will be featured on #LivePD this weekend!" in November 2018.

96.     Defendant Chody later tweeted, "I believe having #LivePD in WilCo is a necessary tool for our office for many reasons … [and] the community at a large scale approves."

97.     Defendant Chody later endorsed a t-shirt that said "Trust me. I watch Live PD, I'm basically a cop," by tweeting "I want this shirt!!!!! #LivePD #LivePDNation."

98.     Defendant Chody even let Live PD continue production during the COVID-19 pandemic, despite Williamson County's "stay-at-home" order that made reality TV crews "non-essential" workers.

99.     Defendant Chody believed that Live PD helped his department recruit officers and made it an essential component of the Williamson County Sheriff's Department.

100.    Defendant Chody encouraged his officers to engage in dangerous, high-risk police tactics because it made for more entertaining television in service to Live PD.

101.    If Live PD producers considered a department "boring," its activities would not be broadcast. Thus, Defendant Chody prioritized producing "exciting" content for Live PD over the health and safety of the County's citizens.

102.    For example, Defendant Chody's deputies, with Live PD camera crews in tow, broke down the door of a suspect wanted on a warrant, when the same suspect had been at the Williamson County Courthouse the same day to appear on another charge. Rather than arrest him on the warrant during the court appearance, as Defendant Chody's deputies easily could have, Defendant Chody and Live PD sent officers in tactical gear to break down the suspect's door and invade his home because peacefully making arrests during court appearances is boring television.

103.    In another incident, Defendant Chody sent the SWAT team to arrest a suspect wanted for possession of a small amount of drugs by authorizing a no-knock warrant and the use of flash-bang grenades. Defendant Chody's deputies broke down the door of the suspect's mother's home, then fired flash bang grenades into the house, when the suspect was non-violent and could have been arrested without incident. The raid and arrest were broadcast on Live PD.

104.    Thus, among other policies and practices, Defendant Chody's pursuit policy allowed officers to chase motorists who committed trivial traffic violations.

105.    Police chase sequences were a staple of Live PD and were considered "not boring."

106.    Thus, more than half of nearly 100 chases initiated by Williamson County deputies in the last three years, while Live PD was filming, were for traffic violations.

107.    Upon information and belief, many of these chases were initiated or pursued for the benefit of Live PD, at Defendant Chody's direction.

108.    Policies instated by Defendant Chody in January of 2019, despite the continued presence of Live PD and significant increase in pursuits, did not prohibit chases of non-hazardous traffic violations or misdemeanors.

109.    Policies instated by Defendant Chody in January of 2019, despite the continued presence of Live PD and significant increase in pursuits, failed to define for officers what constituted "a crime for which there is an immediate need for apprehension".

110.    In the year that Live PD began partnering with Defendant Chody and Williamson County, the number of police chases by Defendant Chody's department increased 54%.

111.    While Ms. Nembhard's rights were not violated as part of a chase, the facts and statistics regarding Williamson County car chases goes to show the environment of excessive force being encouraged by Defendant Chody and Williamson County.

112.    Defendant Chody's Williamson County deputies chased suspects at a higher rate than any other jurisdiction in Central Texas.

113.    Half of all chases in Williamson County occurred while Live PD camera crews were filming the department.

114.    Over 20% of chases in Williamson County involved Black suspects, though less than 10% of Williamson County residents are Black.

115.    Approximately 60% of Williamson County chases began due to a trivial traffic infraction, like failing to signal, expired license plates, or failure to dim headlights.

116.    Deputy Johnson, one of the deputies involved in the March 2019 death of Javier Ambler, was involved in multiple dangerous chases while working for Defendant Chody, including a chase that reached 100 miles per hour that Johnson began because the driver had his headlights off, and another whose registration sticker had expired.

117.    Defendant Chody has also encouraged officers to use excessive force when they were being filmed by Live PD.

118.    One of Defendant Chody's officers, Jarred Dalton, tweeted in 2019, "Glad we could make some good TV for the boss man." On another occasion, again tweeting about Live PD, Dalton tweeted, "Gonna try to get some good stuff stirred up for y'all tonight."

119.    Live PD also believes that assaulting suspects is "not boring."

120.    Indeed, on June 4, 2019, shortly after Javier Ambler's death, Live PD broadcast a traffic stop where Deputies Johnson and Camden, the deputies involved in

the March 2019 death of Javier Ambler, used excessive force against a suspect stopped for a minor traffic offense.

121.    Williamson County officers electrocuted the suspect with their TASERs multiple times.

122.    Williamson County officers kicked and punched the suspect multiple times, while he was in a defensive position on the ground.

123.    Three Williamson County officers, including Johnson and Camden, the deputies involved in the March 2019 death of Javier Ambler, sat on top of the suspect, while he was face-down on the ground and begging, "I can't breathe" – much like Ambler had earlier.

124.    Neither Johnson nor Camden were disciplined for their role in assaulting this suspect on camera, just as they were not disciplined for killing Javier Ambler – or even suspended pending the investigation into the use of force that killed him.

125.    In fact, Defendant Chody did not exercise his veto to prohibit Live PD from broadcasting this incident because it was exactly the type of content that Defendant Chody hoped to create for Live PD.

126.    Indeed, Defendant Chody would actively encourage his deputies to use force when it was unnecessary.

127.    As discussed above, Defendant Chody's command staff, with his knowledge, awarded gift cards to steakhouses to officers who had "good" uses of force, including Johnson and Camden.

128.    Officers who received gift cards were also awarded the title "WilCo Badass."

129.    This practice encouraged officers to use force more frequently, to "win" more gift cards, to be "WilCo Badass," and to appear on Live PD.

130.    Despite the clear danger to residents of Williamson County, the County Commissioners Court renewed the contract with Live PD in January of 2019.

131.    However, concerned that Live PD turns the worst days of many citizens' lives into crass reality television, many jurisdictions around the country cut ties with the program.

132.    For these reasons, finally in August of 2019, the Williamson County Commissioners Court ordered Defendant Chody to stop allowing Live PD to produce the show in Williamson County.

133.    Defendant Chody ignored the Commissioners Court, and continued allowing Live PD to produce the show in Williamson County.

134.    On May 19, 2020, the Williamson County Commissioners Court then took the rare step of suing Defendant (and then Sheriff) Chody to stop production of Live PD, alleging that "Sheriff Chody can perform the core duties of sheriff without the live TV show. But he doesn't want to. Instead, Sheriff Chody seeks social media and TV exposure like a moth to a light bulb – and he's flown out of his job description to get back on TV."

135.    Instead, the County alleged that Defendant Chody had become a "TV producer, reality TV star, [and] show business agent," and, "jeopardized … citizen protection for TV ratings and exposure" by "prioritize[ing] TV appearance[s] and ratings over safety and proper police work."

### Williamson County and Defendant Chody Hired Dangerous Deputies

136.    A former president of the Williamson County Deputies Association, Mike Klier, similarly alleged that Defendant Chody would hire deputies not based on their ability to be effective sheriff's department officers, but instead to create more exciting

television. "If you are looking for guys who are chasing Hollywood lights with blue [police] lights, you're going to get exactly what we got – and that is a disaster."

137.    In fact, Defendant Chody hired numerous officers who had been disciplined or fired by other law enforcement agencies for being dishonest or using excessive force.

138.    Before Defendant Chody took office, the Sheriff's Department conducted thorough background checks of all potential sheriff's deputies. Defendant Chody ended this practice, and instead implemented a policy where background checks would only examine minimal information, and offenses that would have once disqualified applicants were now ignored.

139.    Former officers of the Williamson County Sheriff's Office described Defendant Chody's new hiring policies as "atrocious."

140.    Two of the officers who Defendant Chody hired based on their television abilities, rather than their actual suitability to serve as police officers, were Deputies Johnson and Camden.

141.    Defendant Chody ignored red-flags in Johnson and Camden's background to hire them.

142.    Both Johnson and Camden were turned down by Williamson County when they had applied to work for the department before Defendant Chody's tenure because of serious problems with their backgrounds as police officers.

143.    Camden's previous employer, the Bastrop County Sheriff's Department, disciplined him three times during a five-month period, including twice for dishonesty.

144.    Bastrop County also required Camden to take additional courses on suspects' constitutional rights after he made a search of a suspect's home without legal justification.

145.    When he applied to work for Defendant Chody's department, two of Camden's references noted he was too "aggressive" when out on patrol.

146.    Williamson County Commissioner Terry Cook was especially critical of Defendant Chody's decision to participate in Live PD, saying the County needs to "get entertainment out of law enforcement. It doesn't belong there."

147.    Williamson County District Attorney Shawn Dick believed that Defendant Chody's participation in Live PD actually prevented his office from prosecuting crimes – by refusing to provide even basic information to the County. "Live PD or no Live PD, the sheriff's office has a responsibility and a duty to get us all the evidence in a case. And whoever they let into a crime scene, we better have the names of those witnesses and the evidence that they can provide. And the sheriff's department has let Live PD into [Defendant Chody's] crime scenes for the last two years, and all I've ever requested were the witnesses that were in the crime scene and the evidence they gathered while they were in the crime scene. And to date we've never gotten that kind of information."

148.    Months before Javier Ambler's death, Dick had told Defendant Chody that he needed to preserve all video recordings made by Live PD, because they would be critical evidence in criminal prosecutions.

149.    Due to Defendant Chody's refusal to provide evidence created by Live PD, Dick was forced to decline to prosecute criminal cases. Despite Dick informing Defendant Chody about this, Defendant Chody still refused to provide the Live PD footage, knowing that some cases would be dismissed. Clearly, Defendant Chody was more interested in making the television program than actual police work.

150.    Thus, during the controversy regarding Live PD, Defendant Chody approved policies and practices, or, alternatively, failed to change or correct existing

practices, that made for more entertaining television but endangered the safety of citizens who interacted with police.

151.    Likewise, Defendant Chody hired officers who were unfit for actual police work, then failed to supervise them to prevent them from violating citizens' constitutional rights, to serve Live PD rather than the people of Williamson County.

152.    Even after Live PD was cancelled, in large part due to the program's role in Javier Amber's death, Defendant Chody continued to support the television program, and re-tweeted statements by the show's host, Dan Abrams.

153.    At no time prior to the filing of their lawsuit for injunctive relief, did the County Commissioners Court move to remove Defendant Chody from office for incompetency or official misconduct by petitioning the Williamson County District Court despite knowledge of his ongoing policy of violating the Constitutional Rights of Williamson County residents.

### Use of Force by Williamson County Deputies Increased

154.    Although Defendant Pisa's encounter with Ms. Nembhard was not captured on "Live PD," cameras had been filming with the department the day before.

155.    Shockingly, fifty-five percent of Williamson County's force incidents in 2019 occurred during just the 29 weeks "Live PD" filmed.

156.    According to University of Missouri-St. Louis professor David Klinger, typically, use-of-force encounters increase in a community if violent crimes increase. However, when "Live PD" embedded with officers week after week, force incidents rose in 2019 compared with the previous year, even though Williamson County's violent crime rate dropped by 7%.

157.    Deputies also used Tasers nearly twice as often in 2019, compared to 2017. Tasers were used in more than half of the force incidents from 2017 to 2019, a rate experts described as excessive. According to Justin Mozzola, a researcher with Amnesty International, "When they use it that often, it is usually indicative of misusing them in instances where it's probably not justified."

158.    While Defendant Pisa did not use a Taser on Ms. Nembhard, this statistic further demonstrates the increased use of unjustifiable and excessive force in the Williamson County Sheriff's Department during this time period.

159.    Nearly three-quarters of the force encounters during the three-year period resulted in injuries.

160.    An Austin American-Statesman analysis of 124 use-of-force reports shows that violent encounters between Williamson County sheriff's deputies and civilians nearly doubled from 43 in 2017 — the year before "Live PD" joined the agency — to 82 in 2019.

161.    Reports show that many of the deputies who used force had been on the job two years or fewer — including Deputy Pisa in this case.

162.    When the TV show started following the department, data shows that deputies began using aggressive tactics more frequently. During the third week of filming with "Live PD," deputies reported four force encounters in a single day, more than any other day from 2017 to 2020.

### Officers were not held accountable

163.    Williamson County deputies were almost never disciplined for using force.

164.    The American-Statesman's analysis of 124 use-of-force reports shows that only two cases over the three years analyzed (2017 to 2019) did supervisors find policy violations.

165.    Deputies James "JJ" Johnson and Zachary Camden, the deputies involved in the March 2019 in-custody death of Javier Ambler were never placed on leave following Ambler's death.

166.    Those same two deputies were involved in another excessive force case involving Ramsey Mitchell just three months later.

167.    Neither deputy was ever placed on leave while the Williamson County Sheriff's Department internal affairs investigators worked to figure out whether either deputy committed any violations of department policy or the law. The Williamson County Sheriff's Department cleared all deputies involved in the Ambler and Mitchell arrests.

168.    Two different supervisors in April 2019 cleared Defendant Pisa of wrongdoing after watching his body and dash camera videos and reviewing the use-of-force report associated with his use of force on Ms. Nembhard that forms the basis of this lawsuit.

169.    However, Defendant Pisa was indicted by a grand jury for the same use of force only six months later in October 2019.

170.    Shockingly, Williamson County rehired Defendant Pisa just three months after he was indicted on one count of Official Oppression and one count of Assault Causing Bodily Injury for his use of excessive force against Ms. Nembhard in this case.

### Williamson County's Failure to Train Defendant Pisa

171.    Defendant Pisa was new to the sheriff's office and turned out to patrol alone less than four months after he graduated from the training academy when he pulled Nembhard over.

172.    An investigation last year by the Texas Commission on Law Enforcement found that the Williamson sheriff's academy changed academic standards without approval to make it easier for some cadets.

173.    Like Defendant Pisa, more than 40% of the deputies named in use-of-force reports since 2017 had been with the department for two years or less, and in at least a dozen cases, deputies involved had been employed for less than a year. It is clear that insufficient training pushed inexperienced officers into the field and causing constitutional violations like in this case with Ms. Nembhard.

174.    Defendant Pisa's training about how to conduct traffic stops and perform de-escalation techniques was abbreviated to rush cadets onto the street. Once Pisa began patrolling in September 2018, supervisors also decreased his field training from the standard five to seven months to only 12 weeks.

175.    In addition to the Williamson County Sheriff's Department cutting short Defendant Pisa's field training, it relied on another deputy, Lorenzo Hernandez, who was the subject of two use-of-force investigations to teach Defendant Pisa how to do his job.

176.    Despite Deputy Lorenzo Hernandez assaulting Spencer Murphy on April 10, 2019 and Williamson County being aware of the assault through a complaint being filed with Defendant Chody and Defendant Chody acknowledging the investigation with Mr. Murphy over Facebook messages, Deputy Lorenzo Hernandez was allowed to continue his role as field training officer and trained Defendant Pisa.

177.    Deputy Lorenzo Hernandez was not removed from the Williamson County Sheriff's Department Field Training Program until October 24, 2019, after responding to a domestic violence call and using excessive force on the victim in that case.

178.    Reducing Defendant Pisa's training to below the Texas Commission standards and employing Deputy Lorenzo Hernandez to train Defendant Pisa despite his known history of excessive force directly caused Defendant Pisa's training to be constitutionally deficient and caused Defendant Pisa to use excessive force against Ms. Nembhard in this case.

179.    The current Williamson County Sheriff, Mike Gleason, stated with regard to Defendant Pisa's use of force against Ms. Nembhard, "I think a lot of those [other Williamson County Sheriff's Office uses of excessive force] were for entertainment value, and this one was just something due to a lack of training."

180.    The Defendant was at all times acting under the color of law.

**IV.**
**CAUSES OF ACTION**

**COUNT ONE**

**DELIBERATE INDIFFERENCE AND CAUSES OF ACTION UNDER**
***Monell v. New York City Department of Social Services***
**Violations of the 4th Amendment Pursuant to 42 U.S.C. § 1983**
**Against Defendant Williamson County**

181.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

182.    Municipalities, including counties and cities, may be held liable under § 1983. *Hampton Co. Nat'l Sur., LLC v. Tunica Cty.*, 543 F.3d 221, 224 (5th Cir. 2008).

183.    A municipality may be liable under § 1983 if the execution of one of its customs or policies deprives a plaintiff of his or her constitutional rights. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690–91 (1978).

184.    Municipal liability may attach where the constitutional deprivation is pursuant to a governmental custom, even if such custom has not received formal approval. *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 166 (5th Cir. 2010) (citing *Monell*, 436 U.S. at 690–91).

185.    "Under the decisions of the Supreme Court and [the Fifth Circuit], municipal liability under section 1983 requires proof of three elements: a policy maker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694).

186.    The plaintiff may demonstrate a "persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Zarnow*, 614 F.3d at 168–69 (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir.1984).

187.    A municipality "cannot be liable for an unwritten custom unless '[a]ctual or constructive knowledge of such custom' is attributable to a city policymaker." *Pena v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (citing *Hicks–Fields*, 860 F.3d at 808.

188.    To establish municipal liability under § 1983 based on an alleged "persistent widespread practice or custom that is so common it could be said to represent municipal policy, actual or constructive knowledge of such practice or custom must be shown." *Malone v. City of Fort Worth*, 297 F. Supp. 3d 645, 654 (N.D. Tex. 2018) (citing *Hicks–Fields*, 860 F.3d at 808).

189.    "Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities..." *Hicks–Fields v. Harris Cty.*, 860 F.3d 803, 808 (5th Cir. 2017)).

## Policymaker

190.    Under Texas law, sheriffs are "final policymakers" in the area of law enforcement for the purposes of holding a county liable under § 1983. *James,* 577 F.3d at 617; citing *Williams*, 352 F.3d at 1013.

191.    Defendant Chody was the Williamson County sheriff and final policymaker and had been delegated policy-making authority by the Williamson County Commissioners Court.

192.    As Sheriff, Defendant Chody was directly involved with implementing each of the Williamson County Sheriff's Department policies and practices discussed in this lawsuit; accordingly, he had actual knowledge of each.

193.    Defendant Chody had actual knowledge of the failure to train and supervise as he was the policymaker in charge of maintaining and implementing the training in the academy and the field training officer program at the department.

194.    Alternatively, Defendant Chody had constructive knowledge of the failure to train and supervise in the academy and the field training officer program at the department, as Defendant Chody would have known of these practices in the department had he exercised his responsibilities. *Hicks–Fields,* 860 F.3d at 808.

195.    Defendant Chody had actual knowledge of the encouragement of the use of excessive force through the use of Live PD as he was the policymaker who initiated the contract with Live PD, tweeted about Live PD and his deputies' exposure on the show, and actively encouraged his deputies to use exciting force to make more exciting television.

196.    Defendant Chody had actual knowledge of the encouragement of the use of excessive force through rewarding deputies with steakhouse gift cards as this was "common knowledge" among the department and was discussed openly at meetings.

197.    Alternatively, Defendant Chody had constructive knowledge of the encouragement of the use of excessive force through rewarding deputies with steakhouse gift cards as this was "common knowledge" among the department and was discussed openly at meetings, and Defendant Chody would have known of this common practice in the department had he exercised his responsibilities. *Hicks–Fields,* 860 F.3d at 808.

198.    Defendant Chody had actual knowledge of the hiring practices that ignored red flags and violations by new hires from other departments as he was actively involved in seeking out and hiring these deputies, in part for their ability to provide exciting uses of force on television for Live PD.

199.    Alternatively, Defendant Chody had constructive knowledge of the hiring practices that ignored red flags and violations by new hires from other departments, as Defendant Chody would have known of this practice in the department had he exercised his responsibilities. *Hicks–Fields,* 860 F.3d at 808.

200.    Defendant Chody had actual knowledge that deputies were not being held accountable for their uses of excessive force because he was responsible for reviewing uses of force and disciplining deputies in his department.

201.    Alternatively, Defendant Chody had constructive knowledge that deputies were not being held accountable for their uses of excessive force, as Defendant Chody would have known of this practice in the department had he exercised his responsibilities. *Hicks–Fields,* 860 F.3d at 808.

## Policy, Custom, and Practice
## Which was Moving Force of Constitutional Violations

202.    The § 1983 causation component requires that the plaintiffs identify, with particularity, the policies or practices they allege cause the constitutional violation, and demonstrate a "direct causal link." *M. D. by Stukenberg v. Abbott*, 907 F.3d 237, 255 (5th Cir. 2018); See *Piotrowski*, 237 F.3d at 580. The Fifth Circuit does not, however, require the court to consider each policy or practice in a vacuum. *Id.* The court may properly consider how individual policies or practices interact with one another within the larger system and how the harmful effects of some policies are exacerbated by others. *Id.*

### Custom, Practice, and Culture of Using Excessive Force

203.    Williamson County created a culture of constitutional violations through incentivizing the excessive use of force, refusing to hold deputies accountable for assaulting citizens, deliberately providing inadequate training to young deputies, deliberately failing to supervise young inexperienced and undertrained deputies, ignoring red flags when hiring deputies with histories of violence, and shifting the purpose of the department from increasing public safety to increasing television ratings through assaults and even death.

204.    The Austin American-Statesman analyzed 124 use-of-force reports from 2017 to 2019 and discovered that only two cases over the three years analyzed did supervisors find policy violations.

205.    On January 25, 2019, Williamson County Sheriff's Deputies used excessive force against Scott Lewis, despite there being no legal justification to do so and pursuant to the Williamson County practice and custom of using excessive force to be "Wilco Badass." No deputies were disciplined for this use of excessive force.

206.    On February 24, 2019, Williamson County Sheriff's Deputies used excessive force against Charles Thornburg, despite there being no legal justification to do so and pursuant to the Williamson County practice and custom of using excessive force to be "Wilco Badass." No deputies were disciplined for this use of excessive force.

207.    On March 28, 2019, Williamson County Sheriff's Deputies used excessive force killing Javier Ambler, despite there being no legal justification to do so and pursuant to the Williamson County practice and custom of using excessive force to be "Wilco Badass." No deputies were disciplined for this use of excessive force.

208.    On April 10, 2019, Williamson County Sheriff's Deputies used excessive force against Spencer Murphy, despite there being no legal justification to do so and pursuant to the Williamson County practice and custom of using excessive force to be "Wilco Badass." No deputies were disciplined for this use of excessive force. Over six months later, Deputy Lorenzo Hernandez was removed from his position as a field training officer over this incident; however, he was promoted to detective shortly thereafter.

209.    On June 2, 2019, a Williamson County Sheriff's Deputy used excessive force against Marquina Gilliam-Hicks by slamming her to the ground for failing to identify herself during a consensual encounter, despite there being no legal justification to do so and pursuant to the Williamson County practice and custom of using excessive force to be "Wilco Badass." This deputy was not disciplined for this use of excessive force.

210.    On June 14, 2019, the same Williamson County Sheriff's Deputies that killed Javier Ambler used excessive force against Ramsey Mitchell, despite there being no legal justification to do so and pursuant to the Williamson County practice and custom of using

excessive force to be "Wilco Badass." The deputies again were not disciplined for this use of excessive force.

211.    The Williamson County Sheriff's Office and Defendant Robert Chody incentivized violence and use of force by Williamson County Sheriff's Deputies by rewarding them with fame and fortune.

212.    Williamson County, under the direct supervision of Williamson County policymaker Sheriff Chody, maintained, implemented, encouraged, and ratified the following unconstitutional policies, with deliberate indifference to the constitutional violations that they were directly causing and would continue to directly cause, such as the excessive use of force by Defendant Pisa against Ms. Nembhard in this case:

    a. Deputies were incentivized and encouraged to use excessive force in a department that fostered a culture and environment of using excessive force.

        i. Williamson County encouraged the use of excessive force by referring to its deputies by the moniker, "Wilco Badass."

        ii. Williamson County encouraged the use of excessive force by rewarded deputies who used force on the job with steakhouse gift cards.

        iii. Williamson County encouraged the use of excessive force through the use of "Live PD," a reality television program that filmed Williamson County deputies on the job.

        iv. Williamson County encouraged the use of excessive force by ignoring the rapid increase of excessive force by Williamson County deputies.

     v.  Williamson County encouraged the use of excessive force by refusing to hold deputies accountable when they used excessive force.

    vi.  Williamson County encouraged using excessive force by hiring deputies with red flags from other departments and with histories of violating constitutional rights and department policies.

   vii.  Williamson County encouraged the use of excessive force by failing to train deputies, such as Defendant Pisa, on de-escalation, use of force, and how to conduct traffic stops.

  viii.  Williamson County encouraged the use of excessive force by failing to supervise deputies, such as Defendant Pisa, by allowing them to patrol on their own before they are ready and without the standard and necessary supervision of a competent field training officer or adequate academy training.

b.  The Williamson County Sheriff's Department encouraged its deputies to be "Wilco Badass" by using force against citizens.

     i.  Defendant Pisa explained, "[t]hey had the intention that we were all 'WilCo badass' and, if you went out there and did your job and you had to use force on somebody and he agreed with it, then you would get a gift card."

c.  The Williamson County Sheriff's Department rewarded deputies who used force on the job with steakhouse gift cards, incentivizing violence and ultimately constitutional violations, like the one Defendant Pisa committed against Ms. Nembhard in this case.

i. Following Defendant Pisa's resignation from the Williamson County Sheriff's Department, the Texas Rangers interviewed him as part of their investigation into his use of force against Ms. Nembhard, which forms the basis of this lawsuit.

ii. During that investigation, Defendant Pisa spoke about Williamson County's use of force incentive program with the steakhouse gift cards.

iii. Among the deputies who received gift cards to places such as Logan's Roadhouse were J.J. Johnson and Zach Camden, the officers involved in the March 2019 death of Javier Ambler II.

iv. Former Sgt. Troy Brogden, who resigned from the department in 2019, corroborated Pisa's claim regarding Williamson County using gift cards as incentives for using force.

v. Defendant Pisa claimed that Commander Deaton would talk about the gift cards during meetings, "It was something everybody knew," Pisa said. "He has even said it to people in meetings."

vi. Former Sgt. Brogden echoed this when he stated, "He [Deaton] would talk about it [gift cards rewarding use of force] in groups, including supervisors meetings and classes," Brogden said. "I was like, 'What the hell?'"

vii. Brogden worked for the agency for 20 years, including as a supervisor overseeing major cases in the criminal investigations division, before resigning last fall.

viii. Defendant Pisa said the department's practice of handing out gift cards in certain use-of-force cases was "common knowledge" and that Deaton was responsible for reviewing incidents and awarding the cards.

ix. Defendant Pisa explained, "[t]hey had the intention that we were all 'WilCo badass' and, if you went out there and did your job and you had to use force on somebody and he agreed with it, then you would get a gift card."

x. As will be discussed further below, the Austin American-Statesman analyzed 124 use-of-force reports from 2017 to 2019 and discovered that only two cases over the three years analyzed did supervisors find policy violations.

xi. Accordingly, these gift cards were being given for using force generally and were an incentive to use force even when force was not justified.

xii. Defendant Pisa stated during his interview with the Texas Rangers that he thought he was going to get a gift card from Deaton because he hands out gift cards for use of force.

xiii. Thus, Williamson County's use of force incentive program rewarding deputies with steakhouse gift cards when they used force directly caused Defendant Pisa to use force against Ms. Nembhard in this case in violation of her Constitutional rights.

d. The Williamson County Sheriff's Department also incentivized violence and ultimately constitutional violations, like the one Defendant Pisa committed

against Ms. Nembhard in this case, through the use of "Live PD," a reality television program that filmed Williamson County deputies on the job and encouraged using excessive force instead of de-escalation techniques to create a more exciting product for Live PD and social media.

 i. Defendant Chody has also encouraged officers to use excessive force when they were being filmed by Live PD.

 ii. One of Defendant Chody's officers, Jarred Dalton, tweeted in 2019, "Glad we could make some good TV for the boss man." On another occasion, again tweeting about Live PD, Dalton tweeted, "Gonna try to get some good stuff stirred up for y'all tonight."

 iii. Live PD also believes that assaulting suspects is "not boring."

 iv. Although Defendant Pisa's encounter with Ms. Nembhard was not captured on "Live PD," cameras had been filming with the department the day before.

 v. Shockingly, fifty-five percent of Williamson County's force incidents in 2019 occurred during just the 29 weeks "Live PD" filmed.

 vi. According to University of Missouri-St. Louis professor David Klinger, typically, use-of-force encounters increase in a community if violent crimes increase. However, when "Live PD" embedded with officers week after week, force incidents rose in 2019 compared with the previous year, even though Williamson County's violent crime rate dropped by 7%.

 vii. Deputies also used Tasers nearly twice as often in 2019, compared to 2017. Tasers were used in more than half of the force incidents from

2017 to 2019, a rate experts described as excessive. According to Justin Mozzola, a researcher with Amnesty International, "When they use it that often, it is usually indicative of misusing them in instances where it's probably not justified."

viii. While Defendant Pisa did not use a Taser on Ms. Nembhard, this statistic further demonstrates the increased use of unjustifiable and excessive force in the Williamson County Sheriff's Department during this time period.

ix. Nearly three-quarters of the force encounters during the three-year period resulted in injuries.

x. An Austin American-Statesman analysis of 124 use-of-force reports shows that violent encounters between Williamson County sheriff's deputies and civilians nearly doubled from 43 in 2017 — the year before "Live PD" joined the agency — to 82 in 2019.

xi. Reports show that many of the deputies who used force had been on the job two years or fewer — including Deputy Pisa in this case.

xii. When the TV show started following the department, data shows that deputies began using aggressive tactics more frequently. Car chases rose by 54% in 2019 compared with the year before. During the third week of filming with "Live PD," deputies reported four force encounters in a single day, more than any other day from 2017 to 2020.

xiii. Defendant Chody regularly promoted Live PD on his social media platforms.

xiv.   Defendant Chody tweeted, "The Williamson County Sheriff's Office is proud & excited to announce that we will be featured on #LivePD this weekend!" in November 2018.

xv.   Defendant Chody later tweeted, "I believe having #LivePD in WilCo is a necessary tool for our office for many reasons … [and] the community at a large scale approves."

xvi.   Defendant Chody later endorsed a t-shirt that said "Trust me. I watch Live PD, I'm basically a cop," by tweeting "I want this shirt!!!!! #LivePD #LivePDNation."

xvii.   Defendant Chody believes that Live PD helps his department recruit officers, and has made it an essential component of the Williamson County Sheriff's Department.

xviii.   Defendant Chody encouraged his officers to engage in dangerous, high-risk police tactics because it made for more entertaining television in service to Live PD.

xix.   If Live PD producers consider a department "boring," its activities will not be broadcast. Thus, Defendant Chody prioritized producing "exciting" content for Live PD over the health and safety of the County's citizens.

xx.   On May 19, 2020, the Williamson County Commissioners Court then took the rare step of suing Defendant Chody to stop production of Live PD, alleging that "Sheriff Chody can perform the core duties of sheriff without the live TV show. But he doesn't want to. Instead, Sheriff Chody seeks social media and TV exposure like a moth to a

light bulb – and he's flown out of his job description to get back on TV."

    xxi.  Instead, the County alleged that Defendant Chody had become a "TV producer, reality TV star, [and] show business agent," and, "jeopardized … citizen protection for TV ratings and exposure" by "prioritize[ing] TV appearance[s] and ratings over safety and proper police work."

e.  Williamson County encouraged using excessive force by hiring deputies with red flags from other departments and with histories of violating constitutional rights and department policies.

    i.  A former president of the Williamson County Deputies Association, Mike Klier, similarly alleged that Defendant Chody would hire deputies not based on their ability to be effective sheriff's department officers, but instead to create more exciting television. "If you are looking for guys who are chasing Hollywood lights with blue [police] lights, you're going to get exactly what we got – and that is a disaster."

    ii.  In fact, Defendant Chody hired numerous officers who had been disciplined or fired by other law enforcement agencies for being dishonest or using excessive force.

    iii.  Before Defendant Chody took office, the Sheriff's Department conducted thorough background checks of all potential sheriff's deputies. Defendant Chody ended this practice, and instead implemented a policy where background checks would only examine

minimal information, and offenses that would have once disqualified applicants were now ignored.

iv.   Former officers of the Williamson County Sheriff's Office described Defendant Chody's new hiring policies as "atrocious."

v.   Two of the officers who Defendant Chody hired based on their television abilities, rather than their actual suitability to serve as police officers, were Deputies Johnson and Camden, the deputies involved in the March 2019 death of Javier Ambler.

vi.   Defendant Chody ignored red flags in Johnson and Camden's background to hire them.

vii.   Both Johnson and Camden were turned down by Williamson County when they had applied to work for the department before Defendant Chody's tenure because of serious problems with their backgrounds as police officers.

viii.   Camden's previous employer, the Bastrop County Sheriff's Department, disciplined him three times during a five-month period, including twice for dishonesty.

ix.   Bastrop County also required Camden to take additional courses on suspects' constitutional rights after he made a search of a suspect's home without legal justification.

x.   **When he applied to work for Defendant Chody's department, two of Camden's references noted he was too "aggressive" when out on patrol.**

xi. Deputy Hernandez was hired in September 2017 by Defendant Chody. Deputy Hernandez had previously worked for the Bastrop County Sheriff and had been suspended in May 2017 for leaving his county-issued duty weapon at a local restaurant in the City of Bastrop. After being hired in Williamson County, he was featured several times on Live PD.

xii. Shockingly, Williamson County rehired Defendant Pisa just three months after he was indicted on one count of Official Oppression and one count of Assault Causing Bodily Injury for his use of excessive force against Ms. Nembhard in this case.

f. The Williamson County Sheriff's Department encouraged using excessive force by failing to hold deputies accountable for using excessive force and instead ratifying their behavior by refusing to discipline them, suspend them pending investigation, or sustain policy violations for using excessive force.

i. The Austin American-Statesman's analysis of 124 use-of-force reports shows that only two cases over the three years analyzed (2017 to 2019) did supervisors find policy violations.

ii. Deputies Johnson and Camden, the deputies involved in the March 2019 death of Javier Ambler were never placed on leave following Ambler's death.

iii. The Williamson County Sheriff's Department cleared all deputies involved in the Lewis, Thornburg, Ambler, Murphy, and Mitchell use

of excessive force incidents prior to Defendant Pisa's use of excessive force against Ms. Nembhard in this case.

    iv. Despite Defendant Pisa's field training officer, Deputy Lorenzo Hernandez using excessive force against Spencer Murphy prior to Defendant Pisa using excessive force against Ms. Nembhard, Deputy Hernandez was allowed to continue operating as a field training officer until October 24, 2019 and then after removal from that position was promoted to detective.

    v. Two different supervisors in April 2019 cleared Defendant Pisa of wrongdoing after watching his body and dash camera videos and reviewing the use-of-force report associated with his use of force on Ms. Nembhard that forms the basis of this lawsuit.

g. Williamson County maintained a policy of failing to train deputies, like Defendant Pisa, in de-escalation, use of force, and conducting traffic stops, by changing academic standards without approval to make it easier for some cadets and supervisors decreasing Defendant Pisa's field training from the standard five to seven months to only 12 weeks, and at the time that Williamson County maintained this inadequate training, it knew that (1) the training procedures used for Defendant Pisa were inadequate as he did not receive the same amount of training in de-escalation, use of force, and conducting traffic stops that is standard in the industry according to the Texas Commission on Law Enforcement and other departments and (2) that this insufficient training would lead to Constitutional violations like it

did in this case when Defendant Pisa used excessive force against Ms. Nembhard.

    i. An investigation last year by the Texas Commission on Law Enforcement found that the Williamson sheriff's academy changed academic standards without approval to make it easier for some cadets.

    ii. Defendant Pisa's training about how to conduct traffic stops, use force, and perform de-escalation techniques was abbreviated to rush cadets, including Defendant Pisa, onto the street.

    iii. Once Defendant Pisa began patrolling in September 2018, supervisors also decreased his field training from the standard five to seven months to only 12 weeks.

    iv. Like Defendant Pisa, more than 40% of the deputies named in use-of-force reports since 2017 had been with the department for two years or less, and in at least a dozen cases, deputies involved had been employed for less than a year.

h. Williamson County maintained a policy of failing to supervise deputies, like Defendant Pisa, by decreasing his field training where he would be patrolling with a supervising officer from the standard five to seven months to only 12 weeks and by allowing Defendant Pisa to patrol alone less than four months after he graduated from the training academy, whose academic training standards Williamson County changed without approval from the Texas Commission on Law Enforcement to make it easier for cadets to pass and get out onto the street patrolling alone, all while knowing that this

insufficient supervision would lead to Constitutional violations like it did in this case when Defendant Pisa used excessive force against Ms. Nembhard.

    i.  In addition to the Williamson County Sheriff's Department cutting short Defendant Pisa's academy and field training, it relied on another deputy, Lorenzo Hernandez, who was the subject of two use-of-force investigations to supervise Defendant Pisa as his Field Training Officer, during the abbreviated period of time that Defendant Pisa was supervised while out on patrol.

213.    The § 1983 causation component requires that the plaintiffs identify, with particularity, the policies or practices they allege cause the constitutional violation, and demonstrate a "direct causal link." *M. D. by Stukenberg*, 907 F.3d at 255; See *Piotrowski*, 237 F.3d at 580. The Fifth Circuit does not, however, require the court to consider each policy or practice in a vacuum. *Id.* The court may properly consider how individual policies or practices interact with one another within the larger system and how the harmful effects of some policies are exacerbated by others. *Id.*

214.    The individual policies and practices outlined above interacted with one another within the larger system and culture of using excessive force against citizens to gain notoriety for the department and the sheriff himself, caused constitutional violations of citizens in the community, such as when Defendant Pisa used excessive force against Ms. Nembhard in this case.

215.    It is clear that the harmful effects of all these policies and practices exacerbated the harmful effects of each other; i.e., failing hiring deputies with red flags, giving them the power to train young deputies, changing the academic standards in the training academy without approval from the Texas Commission on Law Enforcement and

then reducing the standard amount of field training time, allowing the undertrained and unsupervised new cadets to patrol alone, incentivizing uses of force by rewarding deputies with steakhouse gift cards and exposure on the Live PD television show, ignoring rapid increases in uses of force and excessive force, and showing these undertrained and under supervised deputies that the department will not hold deputies who use excessive force accountable by suspending them or sustaining complaints.

216.    As a result, this Court is not required to consider each policy or practice in a vacuum but may instead properly consider how each individual policy or practice interacts with one another within the larger system and how the harmful effects of some policies are exacerbated by others. *M. D. by Stukenberg*, 907 F.3d at 255; *See Piotrowski*, 237 F.3d at 580.

### Williamson County's Failure to Train

217.    To plead a plausible failure-to-train claim, a plaintiff must allege sufficient facts to show: "(1) the training procedures were inadequate; (2) the [county's] policymaker was deliberately indifferent in adopting the training policy; and (3) the inadequate training policy directly caused [the plaintiff's] injury." *Carnaby v. City of Houston*, 636 F.3d 183, 189 (5th Cir. 2011).

218.    Defendant Pisa was new to the sheriff's office and turned out to patrol alone less than four months after he graduated from the training academy when he pulled Ms. Nembhard over and then used excessive force against her.

219.    **An investigation last year by the Texas Commission on Law Enforcement found that the Williamson sheriff's academy changed academic standards without approval to make it easier for some cadets**.

220.   As the policymaker for the Williamson County Sheriff's Department, Defendant Chody was responsible for the training standards at his academy and was also responsible for this change in standards.

221.   Defendant Pisa's training about how to conduct traffic stops and perform de-escalation techniques was abbreviated to rush cadets, including Defendant Pisa, onto the street. **Once Defendant Pisa began patrolling in September 2018, supervisors also decreased his field training from the standard five to seven months to only 12 weeks**.

222.   As a result of the Williamson sheriff's academy changing academic standards without approval to make it easier for some cadets and supervisors decreasing his field training from the standard five to seven months to only 12 weeks, the training procedures used for Defendant Pisa were inadequate as he did not receive the same amount of training in de-escalation, use of force, and conducting traffic stops that is standard in the industry according to the Texas Commission on Law Enforcement and other departments.

223.   Like Defendant Pisa, more than 40% of the deputies named in use-of-force reports since 2017 had been with the department for two years or less, and in at least a dozen cases, deputies involved had been employed for less than a year. It is clear that insufficient training is pushing inexperienced officers into the field and causing constitutional violations like in this case with Ms. Nembhard.

224.   The deliberate decisions to decrease Defendant Pisa's field training from the standard five to seven months to only 12 weeks, to change academic standards without approval from the Texas Commission on Law Enforcement to make it easier for some cadets, and the documented and statistically supported increased emphasis on use of

force through incentives like steak gift cards and fame and exposure on Live PD caused Defendant Pisa to receive inadequate training in de-escalation techniques, use of force, and conducting traffic stops.

225.    In addition to the Williamson County Sheriff's Department cutting short Defendant Pisa's academy and field training, it relied on another deputy, Lorenzo Hernandez, who was the subject of two use-of-force investigations to teach Defendant Pisa how to do his job.

226.    Despite Deputy Lorenzo Hernandez assaulting Spencer Murphy on April 10, 2019 and Williamson County being aware of the assault through a complaint being filed with Defendant Chody and Defendant Chody acknowledging the investigation with Mr. Murphy over Facebook messages, Deputy Lorenzo Hernandez was allowed to continue his role as field training officer and trained Defendant Pisa.

227.    Deputy Lorenzo Hernandez was not removed from the Williamson County Sheriff's Department Field Training Program until October 24, 2019, after responding to a domestic violence call and using excessive force on the victim in that case.

228.    Reducing Defendant Pisa's training to below the Texas Commission standards and employing Deputy Lorenzo Hernandez to train Defendant Pisa despite his known history of excessive force directly caused Defendant Pisa's training to be constitutionally deficient in the areas of de-escalation, use of force, and conducting traffic stops, and caused Defendant Pisa to use excessive force against Ms. Nembhard in violation of her Constitutional rights in this case.

229.    Williamson County's policymaker, Defendant Chody, was deliberately indifferent in adopting these training policies as he knew that they would result in increased excessive uses of force like Defendant Pisa's excessive use of force against Ms.

Nembhard in this case. However, this is exactly what Defendant Chody wanted, so that there would be more "excitement" for the television show Live PD. This is why Williamson County incentivized violence and uses of force through steakhouse gift cards and exposure on the Live PD television show, referred to its deputies as "Wilco Badass," more than 40% of the deputies named in use-of-force reports since 2017 had been with the department for two years or less, and in at least a dozen cases, deputies involved had been employed for less than a year, there was an increase of uses of force, as an Austin American-Statesman analysis of 124 use-of-force reports shows that violent encounters between Williamson County sheriff's deputies and civilians nearly doubled from 43 in 2017 — the year before "Live PD" joined the agency — to 82 in 2019, nearly three-quarters of the force encounters during the three-year period resulted in injuries, and the Austin American-Statesman's analysis of those 124 use-of-force reports shows that only two cases over the three years analyzed (2017 to 2019) did supervisors find policy violations.

230.    Further, the current Williamson County Sheriff, Mike Gleason, stated with regard to Defendant Pisa's use of force against Ms. Nembhard, "I think a lot of those [other Williamson County Sheriff's Office uses of excessive force] were for entertainment value, and this one was just something due to a lack of training."

231.    Ms. Nembhard suffered numerous physical injuries as well as emotional suffering as a direct result of Williamson County's failure to train Defendant Pisa, which resulted in his unconstitutional use of excessive force against Ms. Nembhard in this case.

### Williamson County's Failure to Supervise

232.    A failure-to-supervise claim, a plaintiff must show: "(1) the [county] failed to train or supervise the officers involved; (2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the [the plaintiff's] rights;

and (3) the failure to train or supervise constituted deliberate indifference to the [plaintiff's] constitutional rights." *Peña v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (quoting *Thompson v. Upshur Cty.*, 245 F.3d 447, 459 (5th Cir. 2001)).

233.    Williamson County failed to supervise Defendant Pisa by decreasing his field training where he would be patrolling with a supervising officer from the standard five to seven months to only 12 weeks and by allowing Defendant Pisa to patrol alone less than four months after he graduated from the training academy, whose academic training standards Williamson County changed without approval from the Texas Commission on Law Enforcement to make it easier for cadets to pass and get out onto the street patrolling alone.

234.    Defendant Pisa was new to the sheriff's office and turned out to patrol alone less than four months after he graduated from the training academy when he pulled Ms. Nembhard over and then used excessive force against her.

235.    **An investigation last year by the Texas Commission on Law Enforcement found that the Williamson sheriff's academy changed academic standards without approval to make it easier for some cadets**.

236.    As the policymaker for the Williamson County Sheriff's Department, Defendant Chody was responsible for the training standards at his academy and was also responsible for this change in standards.

237.    Defendant Pisa's training about how to conduct traffic stops and perform de-escalation techniques was abbreviated to rush cadets, including Defendant Pisa, onto the street. **Once Defendant Pisa began patrolling in September 2018, supervisors also decreased his field training from the standard five to seven months to only 12 weeks**.

238.   As a result of the Williamson sheriff's academy changing academic standards without approval to make it easier for some cadets and supervisors decreasing his field training from the standard five to seven months to only 12 weeks, Defendant Pisa was allowed to patrol by himself without supervision despite not receiving the training he required in de-escalation, use of force, and conducting traffic stops, which resulted in the Ms. Nembhard's Constitutional violations in this case.

239.   The deliberate decisions to decrease Defendant Pisa's field training from the standard five to seven months to only 12 weeks, to change academic standards without approval from the Texas Commission on Law Enforcement to make it easier for some cadets, and the documented and statistically supported increased emphasis on use of force through incentives like steak gift cards and fame and exposure on Live PD caused Defendant Pisa to receive inadequate training in de-escalation techniques, use of force, and conducting traffic stops.

240.   In addition to the Williamson County Sheriff's Department cutting short Defendant Pisa's academy and field training, it relied on another deputy, Lorenzo Hernandez, who was the subject of two use-of-force investigations to supervise Defendant Pisa as his Field Training Officer, during the abbreviated period of time that Defendant Pisa was supervised while out on patrol.

241.   Despite Deputy Lorenzo Hernandez assaulting Spencer Murphy on April 10, 2019 and Williamson County being aware of the assault through a complaint being filed with Defendant Chody and Defendant Chody acknowledging the investigation with Mr. Murphy over Facebook messages, Deputy Lorenzo Hernandez was allowed to continue his role as field training officer and trained Defendant Pisa.

242.    Deputy Lorenzo Hernandez was not removed from the Williamson County Sheriff's Department Field Training Program until October 24, 2019, after responding to a domestic violence call and using excessive force on the victim in that case.

243.    Two months later, the Williamson County Sheriff's Office promoted him to detective.

244.    Deputy Hernandez was hired in September 2017 by Sheriff Robert Chody. Deputy Hernandez had previously worked for the Bastrop County Sheriff and had been suspended in May 2017 for leaving his county-issued duty weapon at a local restaurant in the City of Bastrop. After being hired in Williamson County, he was featured several times on Live PD.

245.    This demonstrates the type of officers Williamson County allowed to supervise young deputies like Defendant Pisa.

246.    Like Defendant Pisa, more than 40% of the deputies named in use-of-force reports since 2017 had been with the department for two years or less, and in at least a dozen cases, deputies involved had been employed for less than a year. It is clear that insufficient supervision of inexperienced officers in the field was causing constitutional violations like in this case with Ms. Nembhard.

247.    Upon information and belief, Williamson County and Defendant Chody were aware of Deputy Lorenzo Hernandez' propensity to use excessive force when he was supervising Defendant Pisa.

248.    Williamson County's policymaker, Defendant Chody, was deliberately indifferent in adopting these supervision policies as he knew that they would result in increased excessive uses of force like Defendant Pisa's excessive use of force against Ms. Nembhard in this case. However, this is exactly what Defendant Chody wanted, so that

there would be more "excitement" for the television show Live PD. This is why Williamson County incentivized violence and uses of force through steakhouse gift cards and exposure on the Live PD television show, referred to its deputies as "Wilco Badass," more than 40% of the deputies named in use-of-force reports since 2017 had been with the department for two years or less, and in at least a dozen cases, deputies involved had been employed for less than a year, there was an increase of uses of force, as an Austin American-Statesman analysis of 124 use-of-force reports shows that violent encounters between Williamson County sheriff's deputies and civilians nearly doubled from 43 in 2017 — the year before "Live PD" joined the agency — to 82 in 2019, nearly three-quarters of the force encounters during the three-year period resulted in injuries, and the Austin American-Statesman's analysis of those 124 use-of-force reports shows that only two cases over the three years analyzed (2017 to 2019) did supervisors find policy violations.

249.    Ms. Nembhard suffered numerous physical injuries as well as emotional suffering as a direct result of Williamson County's failure to supervise Defendant Pisa, which resulted in his unconstitutional use of excessive force against Ms. Nembhard in this case.

## Count Two

### Supervisory Liability
### Violation of the Fourth Amendment Pursuant to 42 U.S.C. § 1983
### Against Defendant Chody

250.    A supervisor may be held liable if there exists (1) personal involvement in a constitutional deprivation, (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation, or (3) if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional

rights and is the moving force of the constitutional violation. *See Thompkins,* 828 F.2d at 304; *Terry v. LeBlanc*, 479 F.App'x 644, 646 (5th Cir. 2012).

251.    The first is where a supervisor "implements unconstitutional policies that causally result in the constitutional injury." *Peña v. City of Rio Grande City*, 879 F.3d 613, 620 (5th Cir. 2018) (citing *Gates v. Tex. Dep't of Prot. & Reg. Servs.*, 537 F.3d 404, 435 (5th Cir. 2008)). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

252.    To proceed beyond the pleading stage, a complaint's "description of a policy or custom and its relationship to the underlying constitutional violation . . . cannot be conclusory; it must contain specific facts." *Peña*, 879 F.3d at 622 (citing *Spiller v. City of Tex. City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997)).

253.    The second and third are where the supervisor failed to supervise or failed to train the subordinate, and a causal link exists between the failure and the violation of a plaintiff's rights. *See Goodman v. Harris Cnty.,* 571 F.3d 388, 395 (5th Cir. 2009). "[F]or a supervisor to be liable for failure to train, the focus must be on the adequacy of the training program in relation to the tasks the particular officers must perform." *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005) (citation omitted). And "for liability to attach based on an 'inadequate training' claim, a plaintiff must allege with specificity how a particular training program is defective." *Id.*

254.    The three circumstances require a showing that the defendant acted with deliberate indifference. *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor

disregarded a known or obvious consequence of his action." *Id.* at 446–47, (quoting *Connick,* 563 U.S. at 61). The showing of "deliberate indifference" "under section 1983 . . . 'generally requires that a plaintiff demonstrate at least a pattern of similar violations.'" *Rios v. City of Del Rio, Tex.,* 444 F.3d 417, 427 (5th Cir. 2006) (citing *Johnson v. Deep E. Tex. Reg'l Narcotics,* 379 F.3d 293, 309 (5th Cir. 2004).

## Defendant Chody's Custom, Practice, and Culture of Using Excessive Force

255.    Defendant Chody created a culture of constitutional violations through incentivizing the excessive use of force, refusing to hold deputies accountable for assaulting citizens, deliberately providing inadequate training to young deputies, deliberately failing to supervise young inexperienced and undertrained deputies, ignoring red flags when hiring deputies with histories of violence, and shifting the purpose of the department from increasing public safety to increasing television ratings through assaults and even death.

256.    The Austin American-Statesman analyzed 124 use-of-force reports from 2017 to 2019 and discovered that only two cases over the three years analyzed did supervisors find policy violations.

257.    On January 25, 2019, Williamson County Sheriff's Deputies used excessive force against Scott Lewis, despite there being no legal justification to do so and pursuant to the Williamson County practice and custom of using excessive force to be "Wilco Badass." No deputies were disciplined for this use of excessive force.

258.    On February 24, 2019, Williamson County Sheriff's Deputies used excessive force against Charles Thornburg, despite there being no legal justification to do so and pursuant to the Williamson County practice and custom of using excessive force to be "Wilco Badass." No deputies were disciplined for this use of excessive force.

259.    On March 28, 2019, Williamson County Sheriff's Deputies used excessive force killing Javier Ambler, despite there being no legal justification to do so and pursuant to the Williamson County practice and custom of using excessive force to be "Wilco Badass." No deputies were disciplined for this use of excessive force.

260.    On April 10, 2019, Williamson County Sheriff's Deputies used excessive force against Spencer Murphy, despite there being no legal justification to do so and pursuant to the Williamson County practice and custom of using excessive force to be "Wilco Badass." No deputies were disciplined for this use of excessive force. Over six months later, Deputy Lorenzo Hernandez was removed from his position as a field training officer over this incident; however, he was promoted to detective shortly thereafter.

261.    On June 2, 2019, a Williamson County Sheriff's Deputy used excessive force against Marquina Gilliam-Hicks by slamming her to the ground for failing to identify herself during a consensual encounter, despite there being no legal justification to do so and pursuant to the Williamson County practice and custom of using excessive force to be "Wilco Badass." This deputy was not disciplined for this use of excessive force.

262.    On June 14, 2019, the same Williamson County Sheriff's Deputies that killed Javier Ambler used excessive force against Ramsey Mitchell, despite there being no legal justification to do so and pursuant to the Williamson County practice and custom of using excessive force to be "Wilco Badass." The deputies again were not disciplined for this use of excessive force.

263.    Defendant Chody incentivized violence and use of force by Williamson County Sheriff's Deputies by rewarding them with fame and fortune.

264.    Defendant Chody, as sheriff, maintained, implemented, encouraged, and ratified the following unconstitutional policies, with deliberate indifference to the constitutional violations that they were directly causing and would continue to directly cause, such as the excessive use of force by Defendant Pisa against Ms. Nembhard in this case:

    a.  Deputies were incentivized and encouraged to use excessive force in a department that fostered a culture and environment of using excessive force.

        i.  Defendant Chody encouraged the use of excessive force by referring to its deputies by the moniker, "Wilco Badass."

        ii.  Defendant Chody encouraged the use of excessive force by rewarded deputies who used force on the job with steakhouse gift cards.

        iii.  Defendant Chody encouraged the use of excessive force through the use of "Live PD," a reality television program that filmed Williamson County deputies on the job.

        iv.  Defendant Chody encouraged the use of excessive force by ignoring the rapid increase of excessive force by Williamson County deputies.

        v.  Defendant Chody encouraged the use of excessive force by refusing to hold deputies accountable when they used excessive force.

        vi.  Defendant Chody encouraged using excessive force by hiring deputies with red flags from other departments and with histories of violating constitutional rights and department policies.

vii.  Defendant Chody encouraged the use of excessive force by failing to train deputies, such as Defendant Pisa, on de-escalation, use of force, and how to conduct traffic stops.

viii.  Defendant Chody encouraged the use of excessive force by failing to supervise deputies, such as Defendant Pisa, by allowing them to patrol on their own before they are ready and without the standard and necessary supervision of a competent field training officer or adequate academy training.

b.  Defendant Chody encouraged his deputies to be "Wilco Badass" by using force against citizens.

i.  Defendant Pisa explained, "[t]hey had the intention that we were all 'WilCo badass' and, if you went out there and did your job and you had to use force on somebody and he agreed with it, then you would get a gift card."

c.  Defendant Chody rewarded deputies who used force on the job with steakhouse gift cards, incentivizing violence and ultimately constitutional violations, like the one Defendant Pisa committed against Ms. Nembhard in this case.

i.  Following Defendant Pisa's resignation from the Williamson County Sheriff's Department, the Texas Rangers interviewed him as part of their investigation into his use of force against Ms. Nembhard, which forms the basis of this lawsuit.

ii. During that investigation, Defendant Pisa spoke about Defendant Chody's use of force incentive program with the steakhouse gift cards.

iii. Among the deputies who received gift cards to places such as Logan's Roadhouse were J.J. Johnson and Zach Camden, the officers involved in the March 2019 death of Javier Ambler II.

iv. Former Sgt. Troy Brogden, who resigned from the department in 2019, corroborated Pisa's claim regarding Williamson County using gift cards as incentives for using force.

v. Defendant Pisa claimed that Commander Deaton would talk about the gift cards during meetings, "It was something everybody knew," Pisa said. "He has even said it to people in meetings."

vi. Former Sgt. Brogden echoed this when he stated, "He [Deaton] would talk about it [gift cards rewarding use of force] in groups, including supervisors meetings and classes," Brogden said. "I was like, 'What the hell?'"

vii. Brogden worked for the agency for 20 years, including as a supervisor overseeing major cases in the criminal investigations division, before resigning last fall.

viii. Defendant Pisa said the department's practice of handing out gift cards in certain use-of-force cases was "common knowledge" and that Deaton was responsible for reviewing incidents and awarding the cards.

ix.  Defendant Pisa explained, "[t]hey had the intention that we were all 'WilCo badass' and, if you went out there and did your job and you had to use force on somebody and he agreed with it, then you would get a gift card."

x.  As will be discussed further below, the Austin American-Statesman analyzed 124 use-of-force reports from 2017 to 2019 and discovered that only two cases over the three years analyzed did supervisors find policy violations.

xi.  Accordingly, these gift cards were being given for using force generally and were an incentive to use force even when force was not justified.

xii.  Defendant Pisa stated during his interview with the Texas Rangers that he thought he was going to get a gift card from Deaton because he hands out gift cards for use of force.

xiii.  Thus, Defendant Chody's use of force incentive program rewarding deputies with steakhouse gift cards when they used force directly caused Defendant Pisa to use force against Ms. Nembhard in this case in violation of her Constitutional rights.

d.  Defendant Chody also incentivized violence and ultimately constitutional violations, like the one Defendant Pisa committed against Ms. Nembhard in this case, through the use of "Live PD," a reality television program that filmed Williamson County deputies on the job and encouraged using excessive force instead of de-escalation techniques to create a more exciting product for Live PD and social media.

i.   Defendant Chody has also encouraged officers to use excessive force when they were being filmed by Live PD.

ii.  One of Defendant Chody's officers, Jarred Dalton, tweeted in 2019, "Glad we could make some good TV for the boss man." On another occasion, again tweeting about Live PD, Dalton tweeted, "Gonna try to get some good stuff stirred up for y'all tonight."

iii. Live PD also believes that assaulting suspects is "not boring."

iv.  Although Defendant Pisa's encounter with Ms. Nembhard was not captured on "Live PD," cameras had been filming with the department the day before.

v.   Shockingly, fifty-five percent of Williamson County's force incidents in 2019 occurred during just the 29 weeks "Live PD" filmed.

vi.  According to University of Missouri-St. Louis professor David Klinger, typically, use-of-force encounters increase in a community if violent crimes increase. However, when "Live PD" embedded with officers week after week, force incidents rose in 2019 compared with the previous year, even though Williamson County's violent crime rate dropped by 7%.

vii. Deputies also used Tasers nearly twice as often in 2019, compared to 2017. Tasers were used in more than half of the force incidents from 2017 to 2019, a rate experts described as excessive. According to Justin Mozzola, a researcher with Amnesty International, "When they use it that often, it is usually indicative of misusing them in instances where it's probably not justified."

60

viii.   While Defendant Pisa did not use a Taser on Ms. Nembhard, this statistic further demonstrates the increased use of unjustifiable and excessive force under the direction and supervision of Defendant Chody during this time period.

ix.   Nearly three-quarters of the force encounters during the three-year period resulted in injuries.

x.   An Austin American-Statesman analysis of 124 use-of-force reports shows that violent encounters between Williamson County sheriff's deputies and civilians nearly doubled from 43 in 2017 — the year before "Live PD" joined the agency — to 82 in 2019.

xi.   Reports show that many of the deputies who used force had been on the job two years or fewer — including Deputy Pisa in this case.

xii.   When the TV show started following the department, data shows that deputies began using aggressive tactics more frequently. Car chases rose by 54% in 2019 compared with the year before. During the third week of filming with "Live PD," deputies reported four force encounters in a single day, more than any other day from 2017 to 2020.

xiii.   Defendant Chody regularly promoted Live PD on his social media platforms.

xiv.   Defendant Chody tweeted, "The Williamson County Sheriff's Office is proud & excited to announce that we will be featured on #LivePD this weekend!" in November 2018.

xv.  Defendant Chody later tweeted, "I believe having #LivePD in WilCo is a necessary tool for our office for many reasons … [and] the community at a large scale approves."

xvi.  Defendant Chody later endorsed a t-shirt that said "Trust me. I watch Live PD, I'm basically a cop," by tweeting "I want this shirt!!!!! #LivePD #LivePDNation."

xvii.  Defendant Chody believes that Live PD helps his department recruit officers, and has made it an essential component of the Williamson County Sheriff's Department.

xviii.  Defendant Chody encouraged his officers to engage in dangerous, high-risk police tactics because it made for more entertaining television in service to Live PD.

xix.  If Live PD producers consider a department "boring," its activities will not be broadcast. Thus, Defendant Chody prioritized producing "exciting" content for Live PD over the health and safety of the County's citizens.

xx.  On May 19, 2020, the Williamson County Commissioners Court then took the rare step of suing Defendant Chody to stop production of Live PD, alleging that "Sheriff Chody can perform the core duties of sheriff without the live TV show. But he doesn't want to. Instead, Sheriff Chody seeks social media and TV exposure like a moth to a light bulb – and he's flown out of his job description to get back on TV."

xxi. Instead, the County alleged that Defendant Chody had become a "TV producer, reality TV star, [and] show business agent," and, "jeopardized ... citizen protection for TV ratings and exposure" by "prioritize[ing] TV appearance[s] and ratings over safety and proper police work."

e. Defendant Chody encouraged using excessive force by hiring deputies with red flags from other departments and with histories of violating constitutional rights and department policies.

    i. A former president of the Williamson County Deputies Association, Mike Klier, similarly alleged that Defendant Chody would hire deputies not based on their ability to be effective sheriff's department officers, but instead to create more exciting television. "If you are looking for guys who are chasing Hollywood lights with blue [police] lights, you're going to get exactly what we got – and that is a disaster."

    ii. In fact, Defendant Chody has hired numerous officers who had been disciplined or fired by other law enforcement agencies for being dishonest or using excessive force.

    iii. Before Defendant Chody took office, the Sheriff's Department conducted thorough background checks of all potential sheriff's deputies. Defendant Chody ended this practice, and instead implemented a policy where background checks would only examine minimal information, and offenses that would have once disqualified applicants were now ignored.

iv. Former officers of the Williamson County Sheriff's Office described Defendant Chody's new hiring policies as "atrocious."

v. Two of the officers who Defendant Chody hired based on their television abilities, rather than their actual suitability to serve as police officers, are Defendants Johnson and Camden.

vi. Defendant Chody ignored red-flags in Johnson and Camden's background to hire them.

vii. Both Johnson and Camden were turned down by Williamson County when they had applied to work for the department before Defendant Chody's tenure because of serious problems with their backgrounds as police officers.

viii. Camden's previous employer, the Bastrop County Sheriff's Department, disciplined him three times during a five-month period, including twice for dishonesty.

ix. Bastrop County also required Camden to take additional courses on suspects' constitutional rights after he made a search of a suspect's home without legal justification.

**x. When he applied to work for Defendant Chody's department, two of Camden's references noted he was too "aggressive" when out on patrol.**

xi. Deputy Hernandez was hired in September 2017 by Defendant Chody. Deputy Hernandez had previously worked for the Bastrop County Sheriff and had been suspended in May 2017 for leaving his county-issued duty weapon at a local restaurant in the City of

Bastrop. After being hired in Williamson County, he was featured several times on Live PD.

f.  Defendant Chody encouraged using excessive force by failing to hold deputies accountable for using excessive force and instead ratifying their behavior by refusing to discipline them, suspend them pending investigation, or sustain policy violations for using excessive force.

    i.  The Austin American-Statesman's analysis of 124 use-of-force reports shows that only two cases over the three years analyzed (2017 to 2019) did supervisors find policy violations.

    ii.  Deputies James "JJ" Johnson and Zachary Camden, the deputies involved in the March 2019 in-custody death of Javier Ambler were never placed on leave following Ambler's death.

    iii.  Under the direction of Defendant Chody, the Williamson County Sheriff's Department cleared all deputies involved in the Lewis, Thornburg, Ambler, Murphy, and Mitchell use of excessive force incidents prior to Defendant Pisa's use of excessive force against Ms. Nembhard in this case.

    iv.  Despite Defendant Pisa's field training officer, under the direction of Defendant Chody, Deputy Lorenzo Hernandez using excessive force against Spencer Murphy prior to Defendant Pisa using excessive force against Ms. Nembhard, Deputy Hernandez was allowed to continue operating as a field training officer until October 24, 2019 and then after removal from that position was promoted to detective.

v.  Under the direction of Defendant Chody, two different supervisors in April 2019 cleared Defendant Pisa of wrongdoing after watching his body and dash camera videos and reviewing the use-of-force report associated with his use of force on Ms. Nembhard that forms the basis of this lawsuit.

g.  Defendant Chody maintained a policy of failing to train deputies, like Defendant Pisa, in de-escalation, use of force, and conducting traffic stops, by changing academic standards without approval to make it easier for some cadets and supervisors decreasing Defendant Pisa's field training from the standard five to seven months to only 12 weeks, and at the time that Defendant Chody maintained this inadequate training, he knew that (1) the training procedures used for Defendant Pisa were inadequate as he did not receive the same amount of training in de-escalation, use of force, and conducting traffic stops that is standard in the industry according to the Texas Commission on Law Enforcement and other departments and (2) that this insufficient training would lead to Constitutional violations like it did in this case when Defendant Pisa used excessive force against Ms. Nembhard.

i.  An investigation last year by the Texas Commission on Law Enforcement found that the Williamson sheriff's academy, maintained and acting according to the direction of Defendant Chody, changed academic standards without approval to make it easier for some cadets.

ii. Defendant Pisa's training about how to conduct traffic stops, use force, and perform de-escalation techniques was abbreviated to rush cadets, including Defendant Pisa, onto the street.

iii. Once Defendant Pisa began patrolling in September 2018, supervisors, acting under the direction of Defendant Chody, also decreased his field training from the standard five to seven months to only 12 weeks.

iv. Like Defendant Pisa, more than 40% of the deputies named in use-of-force reports since 2017 had been with the department for two years or less, and in at least a dozen cases, deputies involved had been employed for less than a year.

h. Defendant Chody maintained a policy of failing to supervise deputies, like Defendant Pisa, by decreasing his field training where he would be patrolling with a supervising officer from the standard five to seven months to only 12 weeks and by allowing Defendant Pisa to patrol alone less than four months after he graduated from the training academy, whose academic training standards Defendant Chody changed without approval from the Texas Commission on Law Enforcement to make it easier for cadets to pass and get out onto the street patrolling alone, all while knowing that this insufficient supervision would lead to Constitutional violations like it did in this case when Defendant Pisa used excessive force against Ms. Nembhard.

i. In addition to the Williamson County Sheriff's Department, under the direction of Defendant Chody, cutting short Defendant Pisa's academy and field training, it relied on another deputy, Lorenzo

Hernandez, who was the subject of two use-of-force investigations to supervise Defendant Pisa as his Field Training Officer, during the abbreviated period of time that Defendant Pisa was supervised while out on patrol.

265.   The § 1983 causation component requires that the plaintiffs identify, with particularity, the policies or practices they allege cause the constitutional violation, and demonstrate a "direct causal link." *M. D. by Stukenberg*, 907 F.3d at 255; See *Piotrowski*, 237 F.3d at 580. The Fifth Circuit does not, however, require the court to consider each policy or practice in a vacuum. *Id*. The court may properly consider how individual policies or practices interact with one another within the larger system and how the harmful effects of some policies are exacerbated by others. *Id*.

266.   Defendant Chody's individual policies and practices outlined above interacted with one another within the larger system and culture of using excessive force against citizens to gain notoriety for the department and the sheriff himself, caused constitutional violations of citizens in the community, such as when Defendant Pisa used excessive force against Ms. Nembhard in this case.

267.   It is clear that the harmful effects of all of Defendant Chody's policies and practices exacerbated the harmful effects of each other; i.e., failing hiring deputies with red flags, giving them the power to train young deputies, changing the academic standards in the training academy without approval from the Texas Commission on Law Enforcement and then reducing the standard amount of field training time, allowing the undertrained and unsupervised new cadets to patrol alone, incentivizing uses of force by rewarding deputies with steakhouse gift cards and exposure on the Live PD television show, ignoring rapid increases in uses of force and excessive force, and showing these

undertrained and under supervised deputies that the department will not hold deputies who use excessive force accountable by suspending them or sustaining complaints.

268.   As a result, this Court is not required to consider each policy or practice in a vacuum but may instead properly consider how each individual policy or practice interacts with one another within the larger system Defendant Chody put together and how the harmful effects of some of Defendant Chody's policies are exacerbated by others. *M. D. by Stukenberg*, 907 F.3d at 255; *See Piotrowski*, 237 F.3d at 580.

### Defendant Chody's Failure to Train

269.   Plaintiff must show the supervisor failed to supervise or failed to train the subordinate, and a causal link exists between the failure and the violation of a plaintiff's rights. *See Goodman,* 571 F.3d at 395. "[F]or a supervisor to be liable for failure to train, the focus must be on the adequacy of the training program in relation to the tasks the particular officers must perform." *Roberts*, 397 F.3d at 293.  And "for liability to attach based on an 'inadequate training' claim, a plaintiff must allege with specificity how a particular training program is defective." *Id*.

270.   As the sheriff and policymaker for the Williamson County Sheriff's Department, Defendant Chody was responsible for the training standards at his academy and was also responsible for this change in standards.

271.   Defendant Pisa was new to the sheriff's office and turned out to patrol alone less than four months after he graduated from the training academy when he pulled Ms. Nembhard over and then used excessive force against her.

272.   **An investigation last year by the Texas Commission on Law Enforcement found that the Williamson sheriff's academy, under the**

**direction of Defendant Chody, changed academic standards without approval to make it easier for some cadets**.

273.    Defendant Pisa's training about how to conduct traffic stops and perform de-escalation techniques was abbreviated to rush cadets, including Defendant Pisa, onto the street. **Once Defendant Pisa began patrolling in September 2018, supervisors, acting at the direction of Defendant Chody**, **also decreased his field training from the standard five to seven months to only 12 weeks**.

274.    As a result of the Williamson sheriff's academy, under the direction of Defendant Chody, changing academic standards without approval to make it easier for some cadets and supervisors decreasing his field training from the standard five to seven months to only 12 weeks, the training procedures used for Defendant Pisa were inadequate as he did not receive the same amount of training in de-escalation, use of force, and conducting traffic stops that is standard in the industry according to the Texas Commission on Law Enforcement and other departments.

275.    Like Defendant Pisa, more than 40% of the deputies named in use-of-force reports since 2017 had been with the department for two years or less, and in at least a dozen cases, deputies involved had been employed for less than a year. It is clear that insufficient training is pushing inexperienced officers into the field and causing constitutional violations like in this case with Ms. Nembhard.

276.    The deliberate decisions to decrease Defendant Pisa's field training from the standard five to seven months to only 12 weeks, to change academic standards without approval from the Texas Commission on Law Enforcement to make it easier for some cadets, and the documented and statistically supported increased emphasis on use of force through incentives like steak gift cards and fame and exposure on Live PD caused

Defendant Pisa to receive inadequate training in de-escalation techniques, use of force, and conducting traffic stops.

277.    In addition to the Defendant Chody cutting short Defendant Pisa's academy and field training, Defendant Chody relied on another deputy, Lorenzo Hernandez, who was the subject of two use-of-force investigations to teach Defendant Pisa how to do his job.

278.    Despite Deputy Lorenzo Hernandez assaulting Spencer Murphy on April 10, 2019 and Williamson County being aware of the assault through a complaint being filed with Defendant Chody and Defendant Chody acknowledging the investigation with Mr. Murphy over Facebook messages, Deputy Lorenzo Hernandez was allowed to continue his role as field training officer and trained Defendant Pisa.

279.    Deputy Lorenzo Hernandez was not removed from the Williamson County Sheriff's Department Field Training Program until October 24, 2019, after responding to a domestic violence call and using excessive force on the victim in that case.

280.    Reducing Defendant Pisa's training to below the Texas Commission standards and employing Deputy Lorenzo Hernandez to train Defendant Pisa despite his known history of excessive force directly caused Defendant Pisa's training to be constitutionally deficient in the areas of de-escalation, use of force, and conducting traffic stops, and caused Defendant Pisa to use excessive force against Ms. Nembhard in violation of her Constitutional rights in this case.

281.    Defendant Chody was deliberately indifferent in adopting these training policies as he knew that they would result in increased excessive uses of force like Defendant Pisa's excessive use of force against Ms. Nembhard in this case. However, this is exactly what Defendant Chody wanted, so that there would be more "excitement" for

the television show Live PD. This is why Williamson County incentivized violence and uses of force through steakhouse gift cards and exposure on the Live PD television show, referred to its deputies as "Wilco Badass," more than 40% of the deputies named in use-of-force reports since 2017 had been with the department for two years or less, and in at least a dozen cases, deputies involved had been employed for less than a year, there was an increase of uses of force, as an Austin American-Statesman analysis of 124 use-of-force reports shows that violent encounters between Williamson County sheriff's deputies and civilians nearly doubled from 43 in 2017 — the year before "Live PD" joined the agency — to 82 in 2019, nearly three-quarters of the force encounters during the three-year period resulted in injuries, and the Austin American-Statesman's analysis of those 124 use-of-force reports shows that only two cases over the three years analyzed (2017 to 2019) did supervisors find policy violations.

282.    Further, the current Williamson County Sheriff, Mike Gleason, stated with regard to Defendant Pisa's use of force against Ms. Nembhard, "I think a lot of those [other Williamson County Sheriff's Office uses of excessive force] were for entertainment value, and this one was just something **due to a lack of training**."

283.    Ms. Nembhard suffered numerous physical injuries as well as emotional suffering as a direct result of Defendant Chody's failure to train Defendant Pisa, which resulted in his unconstitutional use of excessive force against Ms. Nembhard in this case.

### Defendant Chody's Failure to Supervise

284.    A failure-to-supervise claim, a plaintiff must show: "(1) the supervisor failed to train or supervise the officers involved; (2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the [the plaintiff's] rights; and (3) the failure to train or supervise constituted deliberate indifference to the

[plaintiff's] constitutional rights." *Peña v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (quoting *Thompson v. Upshur Cty.*, 245 F.3d 447, 459 (5th Cir. 2001)).

285.    Defendant Chody failed to supervise Defendant Pisa by decreasing his field training where he would be patrolling with a supervising officer from the standard five to seven months to only 12 weeks and by allowing Defendant Pisa to patrol alone less than four months after he graduated from the training academy, whose academic training standards Defendant Chody changed without approval from the Texas Commission on Law Enforcement to make it easier for cadets to pass and get out onto the street patrolling alone.

286.    As the sheriff and policymaker for the Williamson County Sheriff's Department, Defendant Chody was responsible for the training standards at his academy and was also responsible for this change in standards.

287.    Defendant Pisa was new to the sheriff's office and turned out to patrol alone less than four months after he graduated from the training academy when he pulled Ms. Nembhard over and then used excessive force against her.

288.    **An investigation last year by the Texas Commission on Law Enforcement found that the Williamson sheriff's academy, under the direction of Defendant Chody, changed academic standards without approval to make it easier for some cadets**.

289.    Defendant Pisa's training about how to conduct traffic stops and perform de-escalation techniques was abbreviated to rush cadets, including Defendant Pisa, onto the street. **Once Defendant Pisa began patrolling in September 2018, supervisors, acting at the direction of Defendant Chody, also decreased his field training from the standard five to seven months to only 12 weeks**.

290.   As a result of Defendant Chody changing academic standards Williamson sheriff's academy  the Williamson sheriff's academy without approval to make it easier for some cadets and supervisors decreasing his field training from the standard five to seven months to only 12 weeks, Defendant Pisa was allowed to patrol by himself without supervision despite not receiving the training he required in de-escalation, use of force, and conducting traffic stops, which resulted in the Ms. Nembhard's Constitutional violations in this case.

291.   The deliberate decisions to decrease Defendant Pisa's field training from the standard five to seven months to only 12 weeks, to change academic standards without approval from the Texas Commission on Law Enforcement to make it easier for some cadets, and the documented and statistically supported increased emphasis on use of force through incentives like steak gift cards and fame and exposure on Live PD caused Defendant Pisa to receive inadequate training in de-escalation techniques, use of force, and conducting traffic stops.

292.   In addition to Defendant Chody cutting short Defendant Pisa's academy and field training, Defendant Chody relied on another deputy, Lorenzo Hernandez, who was the subject of two use-of-force investigations to supervise Defendant Pisa as his Field Training Officer, during the abbreviated period of time that Defendant Pisa was supervised while out on patrol.

293.   Despite Deputy Lorenzo Hernandez assaulting Spencer Murphy on April 10, 2019 and Williamson County being aware of the assault through a complaint being filed with Defendant Chody and Defendant Chody acknowledging the investigation with Mr. Murphy over Facebook messages, Deputy Lorenzo Hernandez was allowed to continue his role as field training officer and trained Defendant Pisa.

294.    Deputy Lorenzo Hernandez was not removed from the Williamson County Sheriff's Department Field Training Program until October 24, 2019, after responding to a domestic violence call and using excessive force on the victim in that case.

295.    Two months later, the Williamson County Sheriff's Office promoted him to detective.

296.    Deputy Hernandez was hired in September 2017 by Defendant Chody. Deputy Hernandez had previously worked for the Bastrop County Sheriff and had been suspended in May 2017 for leaving his county-issued duty weapon at a local restaurant in the City of Bastrop. After being hired in Williamson County, he was featured several times on Live PD.

297.    This demonstrates the type of officers Defendant Chody allowed to supervise young deputies like Defendant Pisa.

298.    Like Defendant Pisa, more than 40% of the deputies named in use-of-force reports since 2017 had been with the department for two years or less, and in at least a dozen cases, deputies involved had been employed for less than a year. It is clear that insufficient supervision of inexperienced officers in the field was causing constitutional violations like in this case with Ms. Nembhard.

299.    Upon information and belief, Defendant Chody was aware of Deputy Lorenzo Hernandez' propensity to use excessive force when he was supervising Defendant Pisa.

300.    Defendant Chody was deliberately indifferent in adopting these supervision policies as he knew that they would result in increased excessive uses of force like Defendant Pisa's excessive use of force against Ms. Nembhard in this case. However, this is exactly what Defendant Chody wanted, so that there would be more "excitement" for

the television show Live PD. This is why Defendant Chody incentivized violence and uses of force through steakhouse gift cards and exposure on the Live PD television show, referred to its deputies as "Wilco Badass," more than 40% of the deputies named in use-of-force reports since 2017 had been with the department for two years or less, and in at least a dozen cases, deputies involved had been employed for less than a year, there was an increase of uses of force, as an Austin American-Statesman analysis of 124 use-of-force reports shows that violent encounters between Williamson County sheriff's deputies and civilians nearly doubled from 43 in 2017 — the year before "Live PD" joined the agency — to 82 in 2019, nearly three-quarters of the force encounters during the three-year period resulted in injuries, and the Austin American-Statesman's analysis of those 124 use-of-force reports shows that only two cases over the three years analyzed (2017 to 2019) did supervisors find policy violations.

301.    Ms. Nembhard suffered numerous physical injuries as well as emotional suffering as a direct result of Defendant Chody's failure to supervise Defendant Pisa, which resulted in his unconstitutional use of excessive force against Ms. Nembhard in this case.

## Count Three

### Excessive Force
### Violation of the Fourth Amendment Pursuant to 42 U.S.C. § 1983
### Against Defendant Pisa

302.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

303.    Acting under the color of law, Defendant Pisa deprived Plaintiff of the rights and privileges secured to her by the Fourth Amendment to the United States Constitution

and by other laws of the United States to be free from illegal and unreasonable seizures by the use of force.

304.    Plaintiff brings this cause of action pursuant to 42 U.S.C. § 1983.

305.    The amount of force used by Defendant Pisa against the Plaintiff as described above, specifically but not limited to, when Defendant Pisa slammed Plaintiff onto the ground, forced his knee into Plaintiff's back, scraped Plaintiff's naked genital area against the pavement, and then ripped Plaintiff's hair from her scalp, when Plaintiff was not actively resisting arrest, presenting a threat, or attempting to flee, was objectively unreasonable under the circumstances and inflicted unnecessary injury, pain, and suffering upon Plaintiff.

306.    [A]lthough the right to make an arrest " 'necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it,' " the permissible degree of force depends on the severity of the crime at issue, whether the suspect posed a threat to the officer's safety, and whether the suspect was resisting arrest or attempting to flee. *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008) (internal citations omitted).

307.    Although officers may need to use "physical force ... to effectuate [a] suspect's compliance" when he refuses to comply with commands during a traffic stop, the officers still must assess "the relationship between the need and the amount of force used." *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012); quoting *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009).

308.    Where an individual's conduct amounts to mere "passive resistance," use of force is not justified. *Trammell v. Fruge*, 868 F.3d 332, 341 (5th Cir. 2017) (finding that the plaintiff pulling his arm away from officers amounted to only passive resistance and did not justify the use of force against plaintiff); *See Hanks v. Rogers*, 853 F.3d 738, 746

(5th Cir. 2017) (determining the plaintiff's initial refusals to follow a police officer's instructions amounted to, "at most, passive resistance" and did not justify the officers use of a " 'half spear' takedown" against the plaintiff); *Deville v. Marcantel*, 567 F.3d 156, 168 (5th Cir. 2009) (the plaintiff's refusal to get out of her car before her husband arrived on the scene constituted passive resistance).

309.    A constitutional violation occurs when an officer tases, strikes, or **violently slams** an arrestee who is not actively resisting arrest. (emphasis added) *Darden v. City of Fort Worth, Texas,* 880 F.3d 722, 731 (5th Cir.).

310.    Fifth Circuit case law makes clear that when an arrestee is not actively resisting arrest the degree of force an officer can employ is reduced. *Id.*

311.    As Ms. Nembhard was not actively resisting arrest, and at most her failure to put her hands behind her back amounted to passive resistance, violently slamming her onto the ground, forcing his knee into her back, scraping her naked genital area against the pavement, and then ripping her hair from her scalp, when Ms. Nembhard was not actively resisting arrest, presenting a threat, or attempting to flee was objectively unreasonable and a use of excessive force in violation of her Constitutional rights under the Fourth Amendment.

312.    A seizure is unreasonable if it results in (a) an injury, (b) that resulted directly and only from a use of force that was clearly excessive, and (c) the excessiveness was clearly unreasonable.

313.    At no time did Ms. Nembhard actively resist Defendant Pisa, as she complied with his order to exit the vehicle and then simply questioned why she was being told to put her hands behind her back during a routine traffic stop for failure to have a

front license plate on the vehicle, which she had been warned about earlier in the day and released without issue.

314.    At no time did Ms. Nembhard strike, punch, hit, push, or kick Defendant Pisa.

315.    At no time did Ms. Nembhard threatened Defendant Pisa physically or verbally, as she complied with his order to exit the vehicle and then simply questioned why she was being told to put her hands behind her back during a routine traffic stop for failure to have a front license plate on the vehicle, which she had been warned about earlier in the day and released without issue.

316.    At no time did Ms. Nembhard attempt to evade or flee from Defendant Pisa, as her two young children were in the back seat of the vehicle, she was driving her brother's car, and she never took any steps or actions indicating an attempt to flee.

317.    At no time was Ms. Nembhard armed with a weapon, nor did she ever reach for her pockets or anywhere that a weapon could have been kept or commit any action that could have reasonably given Defendant Pisa any reason to believe she was armed or was reaching for a weapon.

318.    Plaintiff was not threatening any officer or other person immediately prior to and at the time when Defendant Pisa slammed Plaintiff onto the ground, forced his knee into Plaintiff's back, scraped Plaintiff's naked genital area against the pavement, and then ripped Plaintiff's hair from her scalp, as Plaintiff was simply standing stationary and asking Defendant Pisa to explain why he was ordering her to put her hands behind her back despite the fact that she had complied with his instructions to exit the vehicle and the only infraction he was detaining her for was not having a front license plate on the car.

319.    Plaintiff was not attempting to evade or resist arrest immediately prior to and at the time when Defendant Pisa slammed Plaintiff onto the ground, forced his knee into Plaintiff's back, scraped Plaintiff's naked genital area against the pavement, and then ripped Plaintiff's hair from her scalp, when Plaintiff was not actively resisting arrest, presenting a threat, or attempting to flee, as Plaintiff was simply standing stationary and asking Defendant Pisa to explain why he was ordering her to put her hands behind her back despite the fact that she had complied with his instructions to exit the vehicle and the only infraction he was detaining her for was not having a front license plate on the car.

320.    A reasonable officer would know that the use of force by violently slamming her onto the ground, forcing his knee into her back, scraping her naked genital area against the pavement, and then ripping her hair from her scalp is <u>clearly excessive</u> when engaging with citizens such as Plaintiff, who was not threatening any officer or other person, was unarmed, did not reach for her pocket or anywhere else where a weapon could have been held, was not attempting to evade or resist arrest at the time the force was used, and who the use of force was not warranted.

321.    A reasonable officer would know that the use of force by violently slamming her onto the ground, forcing his knee into her back, scraping her naked genital area against the pavement, and then ripping her hair from her scalp is <u>clearly unreasonable</u> when engaging with citizens such as Plaintiff, who was not threatening any officer or other person, was unarmed, did not reach for her pocket or anywhere else where a weapon could have been held, was not attempting to evade or resist arrest at the time the force was used, and who the use of force was not warranted.

322.    A reasonable officer in Defendant Pisa's position would know that violently slamming Ms. Nembhard onto the ground, forcing his knee into her back, scraping her naked genital area against the pavement, and then ripping her hair from her scalp was clearly unreasonable and excessive, when Plaintiff was not threatening any officer or other person, was unarmed, did not reach for her pocket or anywhere else where a weapon could have been held, was not attempting to evade or resist arrest at the time the force was used, and who the use of force was not warranted.

323.    As a direct result of the force used against her by Defendant Pisa, Plaintiff has suffered physical injury, pain and mental anguish for which she sues herein.

324.    These injuries were not caused by any other means.

## VI.
## PUNITIVE DAMAGES

325.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

326.    When viewed objectively from the standpoint of Defendant Pisa, at the time of the occurrence, Defendant Pisa's conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.

327.    As a direct, proximate, and producing cause and the intentional, egregious, malicious conduct by Defendant Pisa, Plaintiff is entitled to recover exemplary damages in an amount within the jurisdictional limits of this Court.

## VII.
## DAMAGES

328.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

329.    Plaintiff's injuries were a foreseeable event. Those injuries were directly and proximately caused by Defendant Pisa's use of excessive and unreasonable force against Plaintiff and the deliberate indifference he showed toward Plaintiff.

330.    As a result, Plaintiff is entitled to recover all actual damages allowed by law. Plaintiff contends Defendant Pisa's conduct constitutes malice, evil intent, or reckless or callous indifference to Plaintiff's constitutionally protected rights. Thus, Plaintiff is entitled to punitive damages.

331.    As a direct and proximate result of the occurrence which made the basis of this lawsuit, Plaintiff was forced to suffer:

    a.   Physical injuries;

    b.   Physical pain and suffering;

    c.   Emotional distress, torment, and mental anguish; and

    d.   Medical Expenses.

332.    Pursuant to 42 U.S.C. § 1983 and 1988, Plaintiff seeks to recover, and hereby requests the award of punitive damages, reasonable attorney's fees, and costs of court.

## VIII.
## ATTORNEY'S FEES

333.    If Plaintiff prevails in this action, by settlement or otherwise, Plaintiff is entitled to and hereby demands attorney's fees under 42 U.S.C. §1988.

## IX.
## JURY REQUEST

334.    Plaintiff respectfully requests a jury trial.

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that judgment be rendered against Defendants, for an amount in excess of the jurisdictional minimum of this Court. Plaintiff further prays for all other relief, both legal and equitable, to which she may show himself justly entitled.

Respectfully submitted,

*/s/ Scott H. Palmer*
SCOTT H. PALMER,
Texas Bar No. 00797196

*/s/ James P. Roberts*
JAMES P. ROBERTS,
Texas Bar No. 24105721

SCOTT H. PALMER, P.C.
15455 Dallas Parkway, Suite 540
Addison, Texas 75001
Telephone: 214.987.4100
Facsimile: 214.922.9900
scott@scottpalmerlaw.com
james@scottpalmerlaw.com

COUNSEL FOR PLAINTIFF